1  CLAUDIA M. NEWMAN, WSBA #24928
   DAVID A. BRICKLIN, ISB # 8565
2

3  Bricklin & Newman, LLP
   1424 Fourth Avenue, Suite 500
4  Seattle, WA 98154
   Telephone: (206) 264-8600
5

6

7

8              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF WASHINGTON
9

10  ALLIANCE FOR THE WILD
    ROCKIES,
11                                    NO. 2:19-cv-00350-SMJ
                          Plaintiff,
12

13       v.                           PLAINTIFF'S  MOTION  FOR
                                      SUMMARY JUDGMENT
14  UNITED STATES FOREST
    SERVICE; VICKI
15  CHRISTIANSEN, Chief of the        11/10/2020
16  Forest Service; KRISTIN BAIL,     With Oral Argument:  10:30 a.m.
    Forest Supervisor for the         LOCATION:  Spokane
17  Okanogan-Wenatchee National
    Forest; and GLENN
18  CASAMASSA, Regional Forester
19  for Region 6 for the U.S. Forest
    Service,
20

21
                          Defendants.
22

23

24

25

26

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - i

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

# TABLE OF CONTENTS

<u>Page</u>

I.   INTRODUCTION ..................................................................................... 1

II.  LEGAL BACKGROUND.......................................................................... 2

   A.   The National Forest Management Act................................................ 2

   B.   The National Environmental Policy Act.............................................. 3

   C.   The Endangered Species Act ............................................................ 7

III. STANDARD OF REVIEW ....................................................................... 9

IV.  ARGUMENT     ...................................................................................... 11

   A.   The Mission Project Is Inconsistent with Forest Plan
        Standards That Require Protection of Deer Habitat ......................... 11

   B.   The Mission Project is Inconsistent with Standards that
        Prohibit Snowplowing Forest Road 43. .............................................. 14

   C.   The Forest Service Failed to Demonstrate Compliance
        with the Forest Plan's Soil Compaction Limit in Violation
        of NFMA     ...................................................................................... 15

   D.   The Forest Service's Failure to Prepare an Environmental
        Impact Statement Violates NEPA...................................................... 17

        1.   The Forest Service inappropriately relied on delayed
             and uncertain mitigation and beneficial impacts to
             justify the FONSI................................................................... 17

        2.   The EA fails to provide a convincing statement of
             reasons to support the Forest Service's FONSI for
             soil disturbance impacts........................................................ 22

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

E.   The Forest Plan and the Mission Project Violate the Endangered Species Act.................................................................25

1.   The Forest Service must reinitiate consultation on the Okanogan National Forest Plan............................................28

2.   The Forest Service's failure to disclose and analyze the Project's impacts on road density is arbitrary and capricious and a violation of the ESA .......................................35

V.   RELIEF          .................................................................................37

VI.   CONCLUSION          .......................................................................39

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                  <u>Pages</u>

*Alliance for the Wild Rockies v. United States Forest Serv.*, 907
F.3d 1105 (9th Cir. 2018). ...........................................................2, 11, 15, 16

*Anderson v. Evans*, 314 F.3d 1006 (9th Cir. 2002) ..............................................22

*Andrus v. Sierra Club*, 442 U.S. 347 (1979) ............................................................4

*Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036 (10th
Cir. 2014) ..................................................................................................................4

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d
1208 (9th Cir. 1998) ...........................................................................4, 5, 6, 23

*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears
v. Peterson*, 685 F.2d 678 (D.C. Cir. 1982)............................................................19

*Calvert Cliffs' Coordinating Committee v. A.E.C.*, 449 F.2d
1109 (D.C. Cir. 1971) .............................................................................................7

*Carmel–By–the–Sea v. U.S. Dep't of Transp.,* 123 F.3d 1142
(9th Cir.1997)........................................................................................................18

*Center for Biological Diversity v. Bureau of Land Management*,
937 F. Supp. 2d 1140 (N.D. Cal. 2013).....................................................................5

*Center for Biological Diversity v. U.S. Dept. Of Interior*, 563 F.
3d 466 (D.C. Cir. 2009) ...........................................................................................3

*Checkosky v. S.E.C.*, 23 F.3d 452 (D.C. Cir. 1994)..............................................38

*City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975).....................................6, 7

*Cold Mountain v. Garber*, 375 F.3d 884 (9th Cir. 2004), as
amended, (Aug. 9, 2004) ..........................................................................................6

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

*Cottonwood Environmental Law Center v. USFS,* 789 F.3d 1075 (9th Cir. 2015)..................................................................................29, 35

*Daniels-Hall v. Nat'l Educ. Ass'n,* 629 F.3d 992 (9th Cir. 2010)..........................26

*Dept. of Homeland Security v. Regents of Univ. of Cal.*, 140 S.Ct. 1891 (2020)..................................................................................9, 10

*Department of Transp. v. Public Citizen*, 541 U.S. 752, 124 S. Ct. 2204, 159 L. Ed. 2d 60 (2004) ...........................................................5

*Envt'l Def. v. Leavitt,* 329 F.Supp. 2d 55 (D.C. Cir. 2004)....................................39

*Friends of Back Bay v. U.S. Army Corps of Engineers*, 681 F.3d 581 (4th Cir. 2012) ............................................................................6

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004) .................................................................9, 34, 35

*Harlem Val. Transp. Ass'n v. Stafford*, 500 F.2d 328 (2d Cir. 1974) ...................................................................................5

*Hoopa Valley Tribe v. NMFS*, 230 F.Supp.3d 1106 (N.D. Cal. 2017) .............................................................................30, 34

*Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002) ..................................................................................11

*Karuk Tribe of California v. USFS,* 681 F.3d 1006 (9th Cir. 2012) ...............................................................................7, 8

*Klamath Siskiyou Wildlands Ctr. v. Boody,* 468 F.3d 549 (9th Cir. 2006) ..................................................................................10

*Klamath-Siskiyou Wildlands Center v. National Oceanic and Atmospheric Administration*, 109 F. Supp. 3d 1238 (N.D. Cal. 2015) ..................................................................................38

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

*Lane County Audubon Soc. v. Jamison, 958* F.2d 290 (9th Cir. 1992) ........................................................................................... 9

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989) ....................................................................................... 10

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 130 S. Ct. 2743, 177 L. Ed. 2d 461 (2010) ................................................... 6

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .............................................................. 10, 36, 37

*National Audubon v. Butler,* 160 F. Supp. 2d 1180 (W.D. Wash 2001) ....................................................................................... 23

*National Audubon Society v. Hoffman*, 132 F.3d 7 (2nd Cir. 1997) ....................................................................................... 18

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008) .......................................................... 19, 22

*Native Ecosystems Council v. U.S. Forest Serv.*, 418 F. 3d 953 (9th Cir. 2005) .......................................................... 10, 11

*Native Ecosystems Council v. Weldon*, 697 F.3d 1043 (9th Cir. 2012) ........................................................................................ 3

*Natural Resources Defense Council, Inc. v. Securities and Exchange Commission*, 606 F.2d 1031 (D.C. Cir. 1979) ................. 10

*Neighbors of Cuddy Mountain v. U.S. Forest Service,* 137 F.3d 1372 (9th Cir. 1998) .......................................................... 10, 18

*Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009) ................................................... 4

*Olympic Forest Coalition v. U.S. Forest Serv.*, 556 F. Supp. 2d 1198 (W.D. Wash. 2008) .................................................... 38

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

*Pacific Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994) ....................... 7, 9

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332 (1989) ...................................................................................................... 4

*Salmon Spawning & Recovery Alliance v. Gutierrez,* 545 F.3d 1220 (9th Cir. 2008) ....................................................................... 9

*Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs,* 486 F.3d 638 (9th Cir. 2007) ...................................................... 38

*Thomas v Peterson*, 753 F. 2d 754 (9th Cir. 1985) .................................. 8

*Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir. 2005) .................................................................................................... 26

*Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) .......................................................................................... 7, 8, 26

*Wyoming Outdoor Council Powder River Basin Res. Council v. U.S. Army Corps of Engineers*, 351 F. Supp. 2d 1232 (D. Wyo. 2005) ...................................................................................................... 17


Statutes and Regulations                                    Pages

36 C.F.R. § 219.10(e) (1998) ............................................................... 11

40 C.F.R. § 1500.1(a) (2006) .................................................................. 3

40 C.F.R. § 1502.1 ................................................................................. 4

40 C.F.R. §1508.9 ................................................................................. 5

40 C.F.R. §1508.9(a) ........................................................................... 22

40 C.F.R. § 1508.27 ......................................................................... 4, 17

40 C.F.R. §§1508.27(b)(4) ................................................................... 6

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

50 C.F.R. § 402.12(f)(2) ...................................................................... 36

50 C.F.R. § 402.14(a) ......................................................................... 35

50 C.F.R. § 402.14(b)(1) ..................................................................... 35

50 C.F.R. § 402.14(g) .......................................................................... 35

50 C.F.R. § 402.16 (2015) ..................................................................... 8

50 C.F.R. § 402.16(b) ...............................................2, 9, 29, 30, 31, 34

5 U.S.C. § 706 ............................................................................... 17, 38

5 U.S.C. §706(2)(A) ........................................................................ 38, 39

5 U.S.C. § 706(2)(A), (C), (D) ............................................................. 10

16 U.S.C. §1531 .............................................................................. 1, 2, 7

16 U.S.C. §1536(a)(2) .................................................................. 7, 35, 37

16 U.S.C. §1536(a)(2)(4) ...................................................................... 34

16 U.S.C. §1536 (b)(3)(A) ................................................................... 35

16 U.S.C. §1536(b)(4) .......................................................................... 35

16 U.S.C. §1536(c) ............................................................................... 35

16 U.S.C. §1536(c)(1) ............................................................................. 8

16 U.S.C. §1540(g) ............................................................................... 39

16 U.S.C. § 1600 ..................................................................................... 1

16 U.S.C. §§ 1600-1687 .......................................................................... 2

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

16 U.S.C §1604 ............................................................................................. 3

16 U.S.C. § 1604(i) ..................................................................................... 11

28 U.S.C. § 2412 ......................................................................................... 39

42 U.S.C. § 4321 ...................................................................................... 1, 7

42 U.S.C. § 4332(2)(C) ............................................................................ 4, 5

<u>Other Authorities</u>                                                          <u>Pages</u>

Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed. Reg. 18,026, 18,038 (Mar. 23 1981) ..................................... 20

51 Fed. Reg. 19926, 19946 (June 3, 1986) ................................................. 8

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

1

**Exhibit List**

2

3

Exhibit 1- FWS Concurrence Letter (November 17, 1989) (from FOIA Response)

4

Exhibit 2 - Memorandum of Understanding (April 27, 2014)

5

Exhibit 3 - Draft Grizzly Bear Restoration Plan EIS (January 2017)

6

7

Exhibit 4 - Notice of Termination (July 7, 2020)

8

Exhibit 5 - Interagency Grizzly Bear Committee Taskforce Report- Grizzly Bear/

9

Motorized Access Management (July 29, 1998)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - x

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

# I.    INTRODUCTION

The United States Forest Service (Forest Service) recently approved the Mission Restoration Project (Mission Project) which authorizes extensive logging and prescribed burning in the Methow Valley Ranger District of the Okanogan-Wenatchee National Forest. Based on an analysis presented in an Environmental Assessment that was prepared by the Forest Service, the Forest Supervisor concluded that the Mission Project will not have any significant adverse environmental impacts.

The decision approving the Mission Project was arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law. Not only did the approval of this Project result in direct violations of the Okanogan Forest Plan, which in turn constitutes a violation of the National Forest Management Act (NFMA), 16 U.S.C. § 1600, *et seq.,* it also resulted in improper environmental review in violation of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321. The Forest Service's failure to prepare an environmental impact statement (EIS) and violations of the Okanogan Forest Plan will harm plant, fish, and animal life and natural ecosystems in the Okanogan-Wenatchee National Forest.

In addition, the Forest Service's "not likely to adversely affect" determination for grizzly bears for the Project is arbitrary and capricious and violates the Endangered Species Act (ESA), 16 U.S.C. § 1531 et. seq. The Forest Service failed to consider the

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 1

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

impacts to grizzly bears from road densities in the Project area and failed to disclose road density calculations to the public.

Finally, on a broader scale, the Forest Service and Fish and Wildlife Service (FWS) are obligated under 50 C.F.R. § 402.16(b) to reinitiate formal consultation for the Okanogan National Forest Plan. When the previous consultation was performed for the plan long ago in 1989, the Forest Service and FWS did not know or understand the effects the Forest Plan would have on grizzly because 1) it did not know its status at the time of consultation; and 2) new science strongly demonstrates that roads negatively impact grizzly bears and emphasizes the importance of minimizing road densities. This new information that was not available at the time of the 1989 consultation is critical to the evaluation of the Forest Plan's effects on grizzly bears. The agencies must reinitiate consultation under the ESA, 16 U.S.C. § 1531, for the Okanogan Forest Plan.

## II.    LEGAL BACKGROUND

### A.    The National Forest Management Act

The National Forest Management Act, 16 U.S.C. §§ 1600-1687, charges the Forest Service with the management of national forest land, including planning for the protection and use of the land and its natural resources. *Alliance for the Wild Rockies v. U.S. Forest Serv.* 907 F.3d 1105, 1109 (9th Cir. 2018). Under NFMA, forest land management occurs on two levels: (1) the forest level, and (2) the individual project

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

level. *Id*. at 1109 *citing Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

At the forest level, each planning unit of the National Forest system is managed under a "Land and Resource Management Plan," which is commonly referred to as a "forest plan." *Id. See also* 16 U.S.C § 1604. Forest plans are strategic documents describing the overall management direction for a national forest. *Id.* A forest plan describes the desired resource conditions across the planning unit and provides allocations, goals, objectives, standards, and guidelines for resource management to maintain or restore these desired resource conditions. *Id*. Specific logging projects, such as the Mission Project, must be consistent with the forest plan – the project must be carried out as directed by the goals, objectives, standards, and guidelines set forth in the forest plan. *See* 16 U.S.C. § 1604.

**B.    The National Environmental Policy Act**

The National Environmental Policy Act of 1969, commonly known as NEPA, is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2006). Ultimately, NEPA ensures that an agency's approval of a project is a fully informed and well-considered decision. *Center for Biological Diversity v. U.S. Dept. Of Interior*, 563 F. 3d 466, 474 (D.C. Cir. 2009).

NEPA requires federal agencies "to the fullest extent possible" prepare an environmental impact statement (EIS) for every major Federal action significantly

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA ensures that the agency will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger public audience. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)

An EIS must "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. NEPA is intended to ensure that environmental concerns are integrated into the very process of agency decisionmaking. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989); *Andrus v. Sierra Club*, 442 U.S. 347 (1979).

Under NEPA, an agency must take a hard look at environmental impacts, which includes considering all foreseeable direct and indirect impacts, without improperly minimizing negative side effects. 40 C.F.R. § 1508.27; *Robertson,* 490 U.S. at 350; *Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009). An agency meets NEPA's hard look requirement when it has made a reasoned evaluation of the available information and its method was not arbitrary or capricious. *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036 (10th Cir. 2014). Reasonable forecasting and speculation is implicit in NEPA and the courts must reject

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 4

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as "crystal ball" inquiry. *Center for Biological Diversity v. Bureau of Land Management*, 937 F. Supp. 2d 1140 (N.D. Cal. 2013).

The matters which must be considered by the agency in the course of making its determination are governed by a rule of reason. *Harlem Val. Transp. Ass'n v. Stafford*, 500 F.2d 328 (2d Cir. 1974). The "rule of reason" ensures that agencies determine whether and to what extent to prepare environmental impact statements based on the usefulness of any new potential information to the decision-making process. *Department of Transp. v. Public Citizen*, 541 U.S. 752, 124 S. Ct. 2204, 159 L. Ed. 2d 60 (2004).

A threshold question in a NEPA case is whether a proposed project will "significantly affect" the environment, thereby triggering the requirement for an EIS. 42 U.S.C. §4332(2)(C); *Blue Mountains Biodiversity Project,* 161 F.3d at 1212. "As a preliminary step, an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS." *Id. citing* 40 C.F.R. § 1508.9. An EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." *Id.* To determine whether a proposed project will have "significant" impacts on the environment, an agency must evaluate, among other

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

things, "the degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. §§ 1508.27(b)(4); *Blue Mountains Biodiversity Project*, 161 F.3d at 1212.

If the agency decides not to prepare an EIS, it must provide a convincing statement of reasons in the EA to explain why the project's impacts are insignificant. *Blue Mountains Biodiversity Project*, 161 F.3d at 1212. Doubts about whether an environmental impact statement is required are resolved in favor of preparing one. *Friends of Back Bay v. U.S. Army Corps of Engineers*, 681 F.3d 581 (4th Cir. 2012). The preparation of an EIS is required whenever it can be fairly argued that the project may have a significant environmental impact, and this is so regardless of whether other substantial evidence supports the opposite conclusion. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 130 S. Ct. 2743, 177 L. Ed. 2d 461 (2010); *Cold Mountain v. Garber*, 375 F.3d 884 (9th Cir. 2004), as amended, (Aug. 9, 2004).

This standard does not require the court to determine whether a challenged project will in fact have significant effects. *Blue Mountains Biodiversity Project*. 161 F. 3d at 1212; *City of Davis v. Coleman*, 521 F.2d 661, 673–74 (9th Cir. 1975). It is enough for the plaintiff to raise substantial questions about whether the project will have a significant effect on the environment. *Id*. In making the determination of significance, it's important to bear in mind that the most serious environmental effects of a project may not be obvious, and that the purpose of the EIS requirement is to ensure

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 6

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

that "to the fullest extent possible" agency decisionmakers have before them and take into proper account a complete analysis of the project's environmental impact. *City of Davis v. Coleman*, 521 F.2d at 673–74 *citing Calvert Cliffs' Coordinating Committee v. A.E.C.*, *supra*, 449 F.2d 1109, 1104 (D.C. Cir. 1971).

### C.    The Endangered Species Act

The Endangered Species Act (ESA), 16 U.S.C. § 1531 et. seq., is designed to ensure that endangered species are protected from government action. Section 7 of the ESA requires the Forest Service, in consultation with FWS, "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species" by evaluating the consequences of the proposed action a listed species. 16 U.S.C. § 1536(a)(2). The Ninth Circuit has described Section 7 as the heart of the ESA. *Karuk Tribe of California v. USFS,* 681 F.3d 1006, 1019 (9th Cir. 2012).

The Forest Service must consult with the FWS for site-specific federal projects as well as for promulgation of land management plans and standards. *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054 (9th Cir. 1994). Only after the agencies comply with Section 7, can any activity that may affect the protected species go forward. *Id.* at 1056-7. The Ninth Circuit holds that "the minimum threshold for an agency action to trigger consultation with FWS is low…." *Western Watersheds Project v.*

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

*Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). The threshold is whether an activity may affect a listed species that may be present.

"Once an agency is aware that an endangered species may be present in the area of its proposed action, the ESA requires it to prepare a biological assessment. . . ." *Thomas v Peterson*, 753 F. 2d 754, 763 (9th Cir. 1985); 16 U.S.C. § 1536(c)(1). The "may be present" threshold includes migratory species that may be present "at some point" within the action area, and the standard does not require confirmation that species are "actually known or believed to occur" in the area. 51 Fed. Reg. 19926, 19946 (June 3, 1986).

Additionally, "any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *Kraayenbrink,* 632 F.3d at 496 (citations omitted). As the Ninth Circuit has stated, "where, as here, a plaintiff alleges a procedural violation under Section 7 of the ESA, as opposed to a substantive violation under Section 9, the plaintiff need not prove that a listed species has in fact been injured." *Karuk Tribe*, 681 F.3d at 1028. Instead, the "plaintiff need only show . . . that the challenged action 'may affect' a listed species. . . ." *Id.*

If Section 7 consultation is completed, but later becomes inadequate, the agencies must reinitiate consultation. 50 C.F.R. § 402.16 (2015). "Reinitiation of formal consultation is required ... [i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 8

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

considered." *Id*. § 402.16(b). "If the data is new and the new data may affect the jeopardy or critical habitat analysis, then the FWS was obligated to reinitiate consultation pursuant to 50 C.F.R. § 402.16." *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv*., 378 F.3d 1059, 1077 (9th Cir. 2004). The duty to reinitiate consultation lies "with both the action agency and the consulting agency." *Salmon Spawning & Recovery Alliance v. Gutierrez,* 545 F.3d 1220, 1229 (9th Cir. 2008).

If an agency has failed to conduct necessary consultation on a forest plan, the timber sales that implement that forest plan must be enjoined. *Pacific Rivers,* 30 F.3d at 1057. Moreover, "the activity cannot go forward even after consultation is initiated if it represents an irreversible and irretrievable commitment of resources as prohibited by §7(d)." *Id*. at 1057 n.15. In the Ninth Circuit, "timber sales constitute per se irreversible and irretrievable commitments of resources under §7(d) and thus could not go forward during the consultation period." *Id*. at 1057; *see also Lane County Audubon Soc. v. Jamison, 9*58 F.2d 290, 295 (9th Cir. 1992) ("the individual sales cannot go forward until the consultation process is complete on the underlying plans . . . .").

### III.    STANDARD OF REVIEW

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dept. of Homeland Security v. Regents of Univ. of Cal.*, 140 S.Ct. 1891, 1905 (2020). It requires agencies to engage in "reasonable decisionmaking." *Id*. Under the APA, a court shall set aside

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "short of statutory right," or found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D); *Klamath Siskiyou Wildlands Ctr. v. Boody,* 468 F.3d 549, 554 (9th Cir. 2006). The court's review of an agency's procedural compliance with statutory norms is an exacting one. *Natural Resources Defense Council, Inc. v. Securities and Exchange Commission*, 606 F.2d 1031 (D.C. Cir. 1979).

Judicial review under this standard is to be "searching" and "careful" and should determine whether the decision was based upon a consideration of the relevant factors. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989). An agency action should be overturned when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). *See also Dept. of Homeland Security*, 140 S. Ct. at 1905. An agency's position that is contrary to the clear language of a forest plan is not entitled to deference. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 962 (9th Cir. 2005); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1377 (9th Cir. 1998).

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 10

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

# IV.    ARGUMENT

### A.    The Mission Project Is Inconsistent with Forest Plan Standards That Require Protection of Deer Habitat.

The Mission Project should be vacated on the grounds that it is inconsistent with Standard and Guidelines in the Okanogan Forest Plan (Forest Plan) that were adopted for the purpose of maintaining deer winter range and fawning habitats.

The NMFA requires that all site-specific projects and activities in the Okanogan Forest be consistent with the Forest Plan. *Alliance for the Wild Rockies*, 907 F.3d at 1109 *citing* 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e) (1998); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F. 3d at 961; *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 962 (9th Cir. 2002). The long-term plans and objectives for the Okanogan National Forest that are established by the Forest Plan must be implemented at the project level. *Alliance for the Wild Rockies*, 907 F.3d at 1119. A site-specific project must comply with the standards set forth in the governing Forest Plan. *Id*. at 1113.

The Forest Plan has identified separate Management Areas (MA's) in the Okanogan Forest that each have different priorities and purposes. For example, Management Area 25 (MA-25) must be managed for intensive timber management and a high level of timber production. AR-01683. MA-24 must be managed to provide for minerals exploration. AR-01681. MA-26, which is relevant here, must be managed

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

specifically for the purpose of maintaining deer habitat. AR-01663, 01687. The goal for MA-26 is: "Maintain deer winter range and fawning habitats to provide conditions which can sustain optimal numbers of deer indefinitely, without degrading habitat characteristics such as forage, cover, and soil." AR-01687. The Forest Plan's desired future condition for MA-26 is:

> Desired Future Condition: Deer winter ranges will be managed to provide optimum habitat conditions for deer by maintaining well distributed winter thermal and snow/intercept thermal cover and foraging areas. Wood product outputs will be provided at a reduced level. Winter recreation activities will be encouraged outside of deer winter range. Access to these areas will be provided on designated through routes to reduce disturbance to wintering deer. Motorized access will be restricted to maintain wildlife habitat effectiveness at higher levels. …

> Deer winter ranges are an essential part of deer habitat since animals concentrate on these areas from well dispersed summer ranges. In the Methow Valley winter ranges are generally found below 5000 feet elevation, but east of the Okanogan River on the 'North-half,' deer winter range is found where coniferous timber stands provide the necessary thermal cover. The spatial distribution of cover and forage areas on the winter ranges is very important to reduce the distances deer are required to move between the habitat components.

AR-01687.

The Forest Plan provides specific standards and guidelines for purposes of achieving the goal and desired conditions set forth above. Standard MA26-20A requires: "Scheduled and non-scheduled timber harvests shall be designed to perpetuate deer habitat and to address current habitat needs." AR-01688. Standard MA26-20I requires: "Operating season for logging and post-sale operations shall be restricted

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 12

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

when necessary to protect roads, soil, water, deer winter range, and fawning areas." AR-01689. Standard MA26-20J requires: "To protect deer during winter, operations shall be prohibited December through March except east of the Okanogan River." *Id*. A broader forest-wide standard (applicable to all MAs), Standard 6-8, requires the Forest Service: "Manage disturbing activities so they occur outside of critical periods to protect, wildlife (*e.g.*, identified parturition areas, nesting sites, wintering areas)." AR-01615.

The Mission Project, which is west of the Okanogan River, proposes to conduct logging operations during the winter in violation of these standards. AR-14840. The EA states that "commercial thinning would be required under winter conditions in some areas to prevent further soil disturbance. Winter soil conditions allow for protection of detrimentally impacted soils from past management while allowing the area to be thinned by mechanized harvesters to achieve project goals." AR-14840. The Draft EA states: "[O]ne method to protect sensitive ash-capped soils from compaction, rutting, displacement or other disturbances is to operate during the winter when the ground is frozen and snow-covered." AR 12478. The final approval decision states that much of the first contract for commercial thinning treatments will "most likely be winter harvested." AR-16788. The second contract "could be harvested in either summer or winter." *Id*.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 13

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

1

2       Because the Mission Project both proposes commercial and noncommercial

3   logging west of the Okanogan River during the winter and specifically relies on winter

4   logging to protect soils, the Mission Project violates the standards quoted above in the

5   Forest Plan. None of the Project documents (the Draft EA, The Final EA or the Final

6   Decision) address this issue.

7

8       **B.    The Mission Project is Inconsistent with Standards that Prohibit
                 Snowplowing Forest Road 43.**

9

10      The USFS fails to demonstrate compliance with Standards and Guidelines 17-6

11  and 17-8 (Access) and Management Area Prescription MA14-17B. Standards 17-6 and

12  17-8 prohibit snowplowing certain portions of Forest Roads 43 and 4300300 and

13  require that those portions be closed to motorized wheeled traffic from December 1 to

14  April 1. AR-01631. MA14-17B prohibits access by motorized vehicles on deer winter

15  range December through March, except through designated through routes. AR-01665.

16

17      The Draft EA states: "In this project, winter operations would require

18  snowplowing Forest Road 43 and winter access on deer winter range, which would

19  require amending Standards and Guidelines." AR-12478. While these proposed Forest

20  Plan Amendments were proposed in the Draft EA, the Final EA states that these

21  amendments were determined to be "unnecessary," but did not explain why. AR-

22  14760.  The USFS failure to demonstrate that the Mission Project complies with

23

24

25

26

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

Standards and Guidelines 17-6 and 17-8 (Access) is a violation of NFMA. *Alliance for the Wild Rockies*, 907 F.3d at 1109.

### C. The Forest Service Failed to Demonstrate Compliance with the Forest Plan's Soil Compaction Limit in Violation of NFMA.

To comply with NFMA, the Forest Service must develop soil quality standards that are incorporated into Forest Plans. Standard and Guideline 13-10 requires that "no more than 15 percent of an area shall be in a puddled, displaced, or compacted condition following completion of management activities." AR-01626. Puddled, displaced, or compacted soil conditions are collectively referred to as "detrimental soil disturbance" or DSD. AR-14423; 14831. Under the methodology for determining soil impacts, the analysis "area" for soils encompasses the land within an individual treatment unit. AR-14422.

"Soil compaction" refers to "a reduction of soil volume, which results in alteration of soil chemical, physical, and biological properties and qualities. AR-15228. Soil compaction limits native plant growth, reduces soil biological activity and water infiltration, limits soil productivity, and reduces the resiliency of plant communities to climactic and biological changes over time. AR-14748. Timber harvest, road construction, fires, and other activities cause detrimental soil disturbance. AR-14427.

The Forest Service fails to demonstrate that the Mission Project complies with Standard 13-10. The Mission Restoration Project Soil Resources Report provides data

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 15

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

on the existing soil conditions that were found in 74 timber units within the Mission Project area. Units 47, 53, 59, 78, and 79 have an existing condition of greater than 15% DSD. AR-14428-29.  Ten other timber units within the Project area are very near 15%. *Id*.

The EA states that both the existing condition and future condition under Alternative 2 are less than 15% average DSD. See AR-14835; 14838; 14843. However, to reach this conclusion, the Forest Service inappropriately relied on an "average" of DSD for the entire Project area instead of assessing the soil conditions in each "timber unit." AR-14838. Standard 13-10 applies to individual timber units, not the average of the entire Project area. Considering that existing conditions reveal that more than 15 percent of the area in five different individual timber units are in a puddled, displaced, or compacted condition now, and 10 other timber units are near that limit, the Forest Service should have modeled the predicted DSD for each timber unit with the Mission Project to assess consistency with Standard 13-10. Considering that the average DSD with the Mission Project is higher than the average for the Non-Action alternative (4-7% vs. 7-10%), it's likely that there will be timber units that exceed the 15% limit following completion of management activities with the Mission Project. The Forest Service therefore cannot demonstrate compliance with this standard in violation of NFMA. *Alliance for the Wild Rockies*, 907 F.3d at 1109.

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

**D.      The Forest Service's Failure to Prepare an Environmental Impact Statement Violates NEPA.**

In her Decision, the Forest Supervisor concluded that the Mission Project would not have any significant adverse effects on the quality of the human environment and therefore, an EIS was not required. AR-16802. The Forest Service's failure to prepare an EIS for the Mission Project was arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706 for the reasons provided below.

**1.      The Forest Service inappropriately relied on delayed and uncertain mitigation and beneficial impacts to justify the FONSI.**

The Forest Service erred when it relied on delayed and uncertain mitigation and/or beneficial impacts of the Mission Project to justify its conclusion that the Project will not have probable significant adverse environmental impacts. The conclusions of the Forest Supervisor with respect to the factors in 40 CFR § 1508.27 (see AR-16802-16805) were incorrect and did not accurately reflect the summary and analysis in the Environmental Assessment.

Mitigation measures can form the basis of a finding of no significant impact but those mitigation measures "must meet some minimal standards." *Wyoming Outdoor Council Powder River Basin Res. Council v. U.S. Army Corps of Engineers*, 351 F. Supp. 2d 1232, 1250 (D. Wyo. 2005). The minimum standards include that "the

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 17

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

mitigation measures must be more than a possibility," and that "the mitigation measures relied upon must constitute an adequate buffer so as to render such impacts so minor as to not warrant an EIS." *Id*. (internal quotations and citations omitted). "Mitigation must 'be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated.'" *Neighbors of Cuddy Mountain,* 137 F.3d at 1380 *citing Carmel–By– the–Sea v. U.S. Dep't of Transp.,* 123 F.3d 1142, 1154 (9th Cir.1997). "[B]road generalizations and vague references to mitigation measures . . . do not constitute the detail as to mitigation measures that would be undertaken, and their effectiveness, that the Forest Service is required to provide." *Id.* at 1081.

In *National Audubon Society v. Hoffman*, 132 F.3d 7 (2nd Cir. 1997), the court emphasized "the requirement that mitigation measures be supported by substantial evidence in order to avoid creating a temptation for federal agencies to rely on mitigation proposals as a way to avoid preparation of an EIS. That is to say, agencies should define 'significance' broadly and not rely on proposed mitigation measures as an excuse to avoid preparing an EIS." *Id.* at 17. When the determination that a significant impact will or will not result from the proposed action is a close call, an EIS should be prepared. *Id.* at 13. That court also said:

> Moreover, we think NEPA's policy goals require agencies to err in favor of preparation of an EIS when the proposed action is likely to have a significant environmental impact. Consequently, we agree with the district court that a party challenging the agency's decision not to prepare an EIS must show only that there is a substantial possibility that the action

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

may have a significant impact on the environment, not that it clearly will have such an impact. The Forest Service's determination that preparation of an EIS was not necessary, based on the record before it, was therefore arbitrary and capricious.

(internal citations omitted). In *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935–36 (9th Cir. 2008), the court said: "We are not persuaded that even a sincere general commitment to future improvements may be included in the proposed action in order to offset its certain immediate negative effects, absent specific and binding plans. Although the record does reflect a general desire to install structural improvements where feasible, it does not show a clear, definite commitment of resources for future improvements."

Where an environmental assessment relies on mitigation measures to reach a finding of no significant impact, that mitigation must be assured to occur and must "completely compensate for any possible adverse environmental impacts," so that "the statutory threshold of significant environmental effects is not crossed and an EIS is not required." *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982).

The Council on Environmental Quality (CEQ) addresses mitigation as follows:

Mitigation measures may be relied upon to make a finding of no significant impact only if they are imposed by statute or regulation, or submitted by an applicant or agency as part of the original proposal. As a general rule, the regulations contemplate that agencies should use a broad approach in defining significance and should not rely on the possibility of mitigation as an excuse to avoid the EIS requirement.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 19

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed. Reg. 18,026, 18,038 (Mar. 23 1981).

> If a proposal appears to have adverse effects that could be significant, and certain mitigation measures are then developed during the scoping or EA stages, the existence of such possible mitigation does not obviate the need for an EIS. Therefore, if scoping or the EA identifies certain mitigation opportunities without altering the nature of the proposal itself, the agency should continue the EIS process and submit the proposal, and the potential mitigation, for public and agency review and comment. This is essential to ensure that the final decision is based on all the relevant factors and that the full NEPA process will result in enforceable mitigation measures through the Record of Decision.

*Id.*

The Mission Project authorizes mitigation and restoration activities that are necessary to avoid significant adverse impacts to fish and wildlife. The Forest Service depends upon them to support its FONSI. *See, e.g.,* AR-14829, 14830, 14934, 14937, 14959, 14961, 14969; 14810.  Should the Mission Project commence, activities that have significant adverse environmental impacts would occur immediately, while the mitigation and beneficial restoration activities may occur some unspecified time in the future, if unspecified funding becomes available.

For example, new road construction will be implemented at the beginning of the Project as needed on all roads that would be used for timber hauling with resulting adverse effects from increased sediment delivery. AR-14762, 14809-14810. The Forest Service alleges that adverse impacts of road reconstruction and maintenance will be

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 20

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

mitigated by the beneficial impacts of road closure and decommissioning, stream habitat improvements, and mitigation. Decommissioning of roads "involves the stabilization and restoration of roads to a more natural state." AR 15214. "Activities used to decommission a road include activities such as reestablishing former drainage patterns, stabilizing slopes, restoring vegetation, blocking the entrance to the road, removing culverts, reestablishing drainage-ways, removing unstable fills, pulling back road shoulders, scattering slash on the roadbed, or other methods designed to meet the specific conditions associated with the unneeded road." *Id.*

However, the EA states that the proposed "non-timber sale" activities "require a level of investment that may not be possible within current or expected levels of appropriations." AR-15063. In other words, the EA states that it may not be possible to fund the road closing/decommissioning activities, the beaver habitat enhancement, rock armoring, culvert replacements, and other non-timber production activities. *Id.*

The EA states, "Road closure and decommissioning would be spread out over the period of the project or after completion of the project depending on where and when funding is available." AR-14762. Similarly, the EA states that the replacement of the bridge over West Fork Buttermilk Creek will "occur at a future date when adequate funds become available." AR-15105. Likewise, culvert replacements that are important for fish passage and habitat connectivity are dependent on not-yet-available funding and would occur at some unknown date in the future only if funding becomes available.

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

AR-15141. ("Culverts will be removed as funding becomes available."). Rock armoring (applying rock to road surfaces as stream crossings) for 27 stream crossings will be treated only if and when funding becomes available. AR-14767.

Although the EA reflects a general desire to employ mitigation where feasible, it does not show a clear, definite commitment of resources for future improvements. There is no specific funding source provided, no indication of any plans to apply for funding, and no clear commitment of resources. AR-14787. No guarantee that the Mission Project mitigation measures will be implemented in a timely manner, or at all exists. Just as in *Nat'l Wildlife Fed'n*, the record "does not show a clear, definite commitment of resources for future improvement." 524 F.3d at 936.   Because funding may never become available and mitigation is uncertain, an EIS should be required. The Forest Service's broad generalizations and vague references to mitigation measures do not constitute the detail as to mitigation measures that would be undertaken, and their effectiveness, that the Forest Service is required to provide.

> **2.    The EA fails to provide a convincing statement of reasons to support the Forest Service's FONSI for soil disturbance impacts.**

An environmental assessment must provide sufficient evidence and analysis for determining whether to prepare an EIS or a FONSI. 40 C.F.R. § 1508.9(a). *See also Anderson v. Evans*, 314 F.3d 1006. 1023 (9th Cir. 2002). If an agency decides not to prepare an EIS, it must provide a 'convincing statement of reasons' in the EA to explain

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.   (206) 264-8600
Fax.   (206) 264-9300

why the project's impacts are insignificant. *Nat'l Audubon Soc. v. Butler*, 160 F. Supp. 2d 1180, 1188 (W.D. Wash 2001); *Blue Mountains Biodiversity Project,* 161 F.3d at 1212. The Mission Project EA does not provide a 'convincing statement of reasons' to explain why the Project's soil compaction impacts are insignificant.

In its assessment of soil impacts, the EA explains that there are several ranges of intensity of impacts: Negligible, Minor, Moderate, and Major. AR-14832. *See also* AR-14423-24. "Moderate" impacts are when "impacts to soil productivity are visible/measurable, have up to 50% of the organic layer removed, and have measurable impacts such as platy soil structure and rutting, but sustains a diverse plant community multiple years after project implementation." *Id*. "Major" impacts are when "impacts to soil productivity are visible/measurable, rutting and compaction exceeds R6 standards, complete or near complete loss of organic matter layer, visible erosion and have measurable impacts decades after project implementation. These types of soil impacts will not sustain a diverse plant community, but rather a monoculture of non-native plants or no plant growth at all." *Id.*

The EA analysis of the No-Action alternative describes what would occur in the area without the Mission Project. AR-14836-37. In that scenario, the condition for compaction, rutting, and puddling will be 4–7% average in each unit. AR-14835. The EA states that Alternative 1 would "continue the long-term, adverse, major impacts on soil compaction in the identified areas." AR-14836. Current soil compaction in 14 units

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

exceeds Region 6 soil standards and no action would "do nothing to reduce the long-term legacy compaction found in the project area." AR-14836.

The EA reports that under Alternative 2, the chosen Alternative, the compaction, rutting, and puddling will be 7–10% average in each unit. AR-14838, 14843. Considering that 7-10% is significantly higher than 4-7%, it's safe to say that the adverse compaction, rutting and puddling impacts will be more significant than the impacts that would occur under the No-Action Alternative. In light of the fact that the EA and the soil report describe 4-7% as a "major" impact, it follows that 7-10% average in each unit soil disturbance is also a "major" impact, in fact even more so.

Nonsensically, in its assessment of Alternative 2 and 3 impacts, the EA concludes that, following soil design features, Alternatives 2 and 3 will result in "adverse, short-term, minor detrimental soil compaction, rutting, and puddling from management activities." AR-14840. A conclusion that soil disturbance that is 4-7% is "major," while soil disturbance that is 7-10% is "minor" is simply not credible and clearly arbitrary and capricious. Then, even more arbitrarily, in its final conclusion on soil impacts, the EA states: "[f]ollowing soil design criteria, Alternatives 2 and 3 would have long-term, *beneficial, moderate* impacts on soil compaction in the identified areas." AR-14843 (emphasis added). It is unclear why the EA description of the same impacts changed from "minor" on one page of the EA to "beneficial and moderate," on a different page of the EA.  Regardless, neither description is credible in light of the

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 24

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

fact that the numbers show that the adverse soil compaction impacts increase in intensity when the Mission Project is employed.

Furthermore, the Forest Service inappropriately relied on an "average" of DSD for the entire Project area for its impact analysis instead of assessing the impacts soil conditions in each "timber unit." *See infra* Section IV.C.  Taking the "average" of all of the units provides a false report of the reality of the situation on the ground.  There are significant adverse soil impacts present currently in a number of timber units as described above in Section IV.C of this motion. The fact that some timber units do not have major soil compaction issue should not and cannot erase the fact that other timber units have major soil compaction issues. As explained above in Section IV.C, it's likely that there will be a number of timber units that exceed the 15% limit following completion of management activities with the Mission Project. Considering that existing conditions reveal that more than 15 % of the area in five different timber units are in a puddled, displaced, or compacted condition now, and 10 other timber units are near that limit, the Forest Service should have assessed the environmental impacts for each timber unit rather than averaging them altogether.

**E.    The Forest Plan and the Mission Project Violate the Endangered Species Act.**

Grizzly bears were listed as a threatened species under the ESA in 1975. SUPP AR-00035. The Forest Service initiated consultation on the Okanogan Forest Plan

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

effects on grizzlies when it adopted that Plan in 1989. AR-00981. However, the

population status of grizzly bears and habitat capability in the Northern Cascades

Ecosystem (NCE) and the Okanogan Forest were unknown at that time. AR-00984.

The 1989 Forest Plan Biological Assessment (Biological Assessment) states, "Because

the population status of the grizzly bear on the Forest is yet to be determined,

assessment of the Impacts of resource projects on bears in difficult." *Id.* Regardless, the

Forest Service determined that the Forest Plan activities were "not likely adversely

affect any listed species or critical habitat." AR-00985. The FWS concurred.

Declaration of Kristine Akland (Jul. 10, 2020), Ex. 1 (FWS Concurrence Letter,

November 17, 1989).[1] The Forest Plan provides no standards or guidelines relating to

the recovery of grizzly bears and their habitat. *See generally* AR-01605 *et seq.*

---

[1] The citations to Exhibits reference exhibits submitted with the Declaration of Kristine M. Akland filed concurrently herewith. The Court may consider these Exhibits for the purposes of reviewing Alliance's ESA claims. *Washington Toxics Coalition v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005); *Western Watersheds Project*, 632 F.3d at 497 (9th Cir. 2011) (Courts may consider evidence outside the administrative record for the limited purposes of reviewing a claim under the ESA). Also, because the Exhibits were drafted by the Forest Service and FWS, this Court may take judicial notice of the exhibits as the documents are "not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FRE 201. Moreover, the Court may take judicial notice of documents posted on a government website. *Daniels-Hall v. Nat'l Educ. Ass'n,* 629 F.3d 998-99 (9th Cir. 2010).

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 26

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

The FWS promulgated the Grizzly Bear Recovery Plan (Recovery Plan) in 1982, revising it most recently in 1993. SUPP AR-00033. The 1993 Recovery Plan designates "recovery zones" and prescribes forest management measures within these zones to protect and facilitate the survival and reproduction of grizzly bears. SUPP AR-00059. Implementation of the Recovery Plan is the responsibility of the Federal and State management agencies where the species occurs. *Id.*

The Recovery Plan established the North Cascades Grizzly Bear Recovery Zone in north-central Washington which includes most of the Okanogan National Forest, and all of the Project area. SUPP AR-00056, 00207; AR-14464

> Verified grizzly tracks were documented in 1989 and 1990 (Almack et al. 1991). Additionally, habitat research confirms that the North Cascades evaluation area offers sufficient amounts of quality habitat to warrant grizzly bear recovery in the area (Servheen et al. 1991). Upon recommendation by the NW Ecosystem Management Subcommittee, [the Interagency Grizzly Bear Committee] approved the North Cascades evaluation area for grizzly bear recovery efforts. Specific boundaries of the North Cascades grizzly bear recovery zone are to be determined by the end of 1993 by an interagency working group.

SUPP AR-00055-56.

In 1997, the FWS supplemented the Recovery Plan with the "North Cascades Ecosystem Recovery Plan Chapter" (NCE Supplement). SUPP AR-00207. The Supplement states: "An analysis of current habitat information for the NCE and estimated grizzly bear densities in similar habitats indicate that the ecosystem will likely support [200-400] bears. . . . Given the present, very small population of grizzly

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 27

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

bears in the NCE, the initial target for human-induced mortality is zero. SUPP AR-00210-211. A "priority action" for the NCE is to "implement the Interagency Grizzly Bear Guidelines." *Id.* 212. To date, however, the Recovery Plan for the NCE has not been implemented.

In 2014, the FWS reaffirmed that the NCE grizzly bear warrants uplisting from threatened to endangered under the ESA. 79 Fed. Reg. 72450 (Dec. 5, 2014). The change in listing status is precluded only by lack of funding. Akland Dec., Ex. 2 (Memorandum of Understanding (April 27, 2014)) at 2. That same year, the FWS, Forest Service, National Parks Service (NPS) and Washington Department of Fish and Wildlife entered into a Memorandum of Understanding (MOU) regarding the "cooperative development of the Environmental Impact Statement for the North Cascades Ecosystem Grizzly Bear Restoration Plan." *Id.* The Agencies again noted that the area "is capable of supporting a self-sustaining grizzly bear population" but that grizzly bears in the NCE "are the most at-risk grizzly bear population in the United States today." *Id.* at 2.

In 2017, the agencies published a Draft Grizzly Bear Restoration Plan and Environmental Impact Statement which proposes to release between 20-200 grizzly bears into the North Cascade Ecosystem to attempt to meet the recovery goal of 200 bears. Akland Dec., Ex. 3 (Draft Grizzly Bear Restoration Plan Environmental Impact

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

Statement (January 2017)) at 3. On July 7, 2020 the Department of Interior "discontinued the proposal." Akland Dec., Ex. 4 (Notice of Termination (July 7, 2020)).

**1.    The Forest Service must reinitiate consultation on the Okanogan National Forest Plan.**

When new information reveals that a forest plan may affect a listed species or critical habitat in a way not previously considered, the Forest Service and FWS have a duty to reinitiate consultation. *Cottonwood Environmental Law Center v. U.S. Forest Serv.,* 789 F.3d 1075, 1088 (9th Cir. 2015). In *Cottonwood*, the Ninth Circuit found that the agencies were required to reinitiate consultation pursuant to 50 C.F.R. § 402.16(b) on the effects of the revised lynx critical habitat consultation. *Id.*

> [The] FWS discovered that the original critical habitat designation had been tainted by an ethical lapse in its own administrative ranks. Re-evaluation of the date generated a drastically different result that justified vast designation of previously unprotected critical habitat. These new protections triggered new obligations. The Forest Service cannot evade its obligations by relying on an analysis it completed before the protections were put in place.

*Id.*

The Court held that the Forest Service was required to reinitiate consultation on all forest plans which govern forests with lynx critical habitat; finding that reinitiation in that circumstance "comports with the ESA's statutory command that agencies consult to ensure the 'continued existence' of listed species." *Id.* at 1087(internal citation omitted). To hold otherwise would "relegate the ESA. . . to a static law that

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 29

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

evaluates and responds to the impact of an action before that action takes place, but does not provide for any further evaluation or response when new information emerges that is critical to the evaluation." *Id.* at 1088.

Similarly, in *Hoopa Valley Tribe v. NMFS*, 230 F.Supp.3d 1106, 1131 (N.D. Cal. 2017), the court held that the reinitiation of formal consultation for the operation of the Klamath Irrigation Project was required. *Id.* at 1130. There, consecutive drought years caused variations in operations of a dam and changes in hydrologic conditions that resulted in a higher rate of disease in Coho salmon that was not analyzed at the time the agencies consulted. The Court found that this new information triggered the requirement to reinitiate formal consultation under 50 C.F.R. § 402.16(b). *Id.*

Here, new data and information exists that may affect the analysis regarding Forest Plan effects on grizzly bears and therefore triggers the Agencies' requirement to reinitiate formal consultation. Since the 1989 consultation on the Forest Plan, several new factors have come to light in regards to grizzly bear recovery.

First, and most notably, it was determined by the Agencies that grizzly bears are present in the North Cascade Ecosystem, specifically in the Okanogan, and the area provides sufficient habitat to maintain and recover between 200 and 400 grizzly bears, as more fully detailed above. SUPP AR-00209; 00055-56. Additionally, bear management units (BMU) have been designated in the Forest, two of which occur on

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

the Project Area: Upper Twisp BMU and Libby BMU. AR-15610. In 2015, a grizzly bear was sighted 60 miles north of the Project area. AR-01164.

As the Forest Service conceded in 1989, "[b]ecause the population status of the grizzly bear on the Forest is yet to be determined, assessment of the impacts of resource projects on bears in difficult." AR-00984. However, as laid out above, the population status of the grizzly bear on the Forest has been determined through the Recovery Plan processes. Additionally, the FWS' determination that the NCE grizzly bear population warrants uplisting and the FWS and NPS's former plan to release grizzly bears into the NCE suggests that the Agencies are fully aware of the population's status. This new information- that grizzly bears are present on the Okanogan; that the Forest is now located within a Recovery Zone; that the area contained sufficient habitat to maintain and recover 200-400 grizzlies - is information not previously known during the 1989 consultation and may reveal "effects of the [Forest Plan] that may affect [grizzly bears] in a manner or to an extent not previously considered." 50 C.F.R §402.16(b). As noted above, "any possible effect" satisfies the low "may affect" standard under the ESA. *Kraayenbrink*, 632 F.3d at 496.

In addition, since the 1989 consultation, it has been repetitively found that roads "pose the most imminent threat to grizzly bear habitat today." SUPP AR-00064. In 1994, FWS concluded, "The density and management of roads is one of the most

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

powerful tools available to balance the needs of people with the needs of bears (revised Draft Recovery Plan)." FWS-39750.

The Forest Service acknowledges that high road density directly impacts the ability of an area to support grizzly bears, leading to underutilization of high-quality habitats. AR-15293. As disclosed in the Project Biological Assessment, "Road avoidance leads to underutilization of habitats that are otherwise high quality (Wisdom et al, 2000). . . . Human access facilitated by roads and trails increases the potential for poaching, collisions with vehicles, and chronic negative human interactions." *Id*. The Biological Assessment discloses that in 2002 and 1996, it was found that "Roads reduce habitat quality for large carnivores as a result of noise, avoidance of human habitat fragmentation and convert areas to non-habitat." *Id*. Mace et al (1996) establishes that, "A properly implemented programme would minimize road density and traffic volume in watersheds having highly preferred habitats. . ." SUPP AR-00277.

Notably, the 1993 Recovery Plan concluded that roads "pose the most imminent threat to grizzly bear habitat today." SUPP AR-00064. Similarly, the Interagency Grizzly Bear Committee (IGBC)[2] recognizes the importance of secure areas *and* low

---

[2] The IGBC was formed in 1983 to help "ensure recovery of viable grizzly bear populations." *See* http://igbconline.org/about-us/ (last visited June 30, 2020). The IGBC is an interagency committee consisting of representatives from the Forest Service, NPS, FWS, the Bureau of Land Management, the U.S. Geological Survey and

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 32

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

road density to grizzly bears and created a Taskforce to "provide a consistent approach to motorized access management between and within grizzly bear ecosystems." Akland Dec., Ex. 5 (Interagency Grizzly Bear Committee Taskforce Report- Grizzly Bear/Motorized Access Management (July 29, 1998)) at 1. The 1998 revised IGBC Taskforce Report concluded that open road density, total motorized rout density, along with the presence of cores areas are "important elements in the management of human access within grizzly bear recovery zones." *Id.*   The Taskforce recommends: 1) delineating the analysis area to that of the approximate size of annual home ranges of an adult female grizzly bear; 2) develop access route density maps and density calculations for *all motorized access routes* (open roads and total roads); and 3) establishment of core areas in all subunits; and 4) define acceptable levels of motorized access. *Id.* at 4-5.

The Forest Plan does not provide a road density standard or objectives to protect, support or maintain grizzly bears and their habitat. However, since the 1989 consultation, the Agencies themselves have come to recognize impacts that roads have on the ability of an area to support grizzly bears and the negative effects roads have on individual bears. Most notably, the IGBC, in which the Forest Service and FWS are

representatives of the state wildlife agencies of Idaho, Montana, Washington and Wyoming. *Id.* The IGBC helps implement the Recovery Plan. *Id.*

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

members, emphasizes the importance of minimizing open and total road density. Akland Dec, Ex 5 at 1, 4-5.

If the basis or baseline for the FWS's jeopardy or no jeopardy opinion is no longer appropriate, the agencies must reinitiate consultation to ensure the continued existence of that species. 16 U.S.C. § 1536(a)(2)(4). Similarly, if the status of a species changes due to factors not consulted on so the basis or baseline for a "not likely to adversely affect" opinion is no longer appropriate, the agencies must reinitiate consultation to ensure that the action does not adversely affect a listed species and possibly jeopardize its continued existence. *Gifford Pinchot Task Force*, 378 F.3d at 1077. Here, the baseline of the Forest Service and FWS's "not likely to adversely affect" opinion is no longer valid because "the population status of grizzly bears on the forest [*has*] been determined." AR-00984. The Forest Service and FWS did not know or understand the effects the Forest Plan would have on grizzly because it did not know its status at the time of consultation. Since then, the grizzly bear's status has been determined and new science has emerged that strongly demonstrates that roads negatively impact grizzly bears and emphasizes the importance of minimizing road densities. The above factors qualify as "new information" that was not available at the time of the 1989 consultation and is critical to the evaluation of the Forest Plan's effects on grizzly bears. Therefore, the Agencies are obligated under 50 C.F.R. §402.16(b) to reinitiate formal consultation for the Okanogan National Forest Plan. *Hoopa Valley*,

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

230 F.Supp.3d at 1131; *Gifford Pinchot*, 378 F.3d at 1077. To do otherwise would relegate the ESA to a static law that does not provide any further evaluation or response when new information emerges that is critical to the evaluation. *Cottonwood*, 789 F.3d at 1088.

> ### 2. The Forest Service's failure to disclose and analyze the Project's impacts on road density is arbitrary and capricious and a violation of the ESA.

Under the consultation process, the Forest Service prepares a biological assessment that evaluates the impacts of its proposed actions on listed species. 16 U.S.C § 1536(c). If the Forest Service determines the action is likely to adversely affect a listed species, formal consultation with FWS is required. 50 C.F.R. § 402.14(a) and (b)(1). At the conclusion of formal consultation, FWS must issue a biological opinion detailing "how the agency action affects the species" and whether the action is "likely to jeopardize the continued existence" of the species. 16 U.S.C. §§ 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14(g). If FWS reaches a "no jeopardy" determination, it may provide for incidental take of the species. 16 U.S.C. § 1536(b)(4). If the Forest Service determines that the action "may affect, is not likely to adversely affect" the listed species, the FWS may issue a letter of concurrence. 50 C.F.R § 402.14(b)(1).

Through Section 7 consultation, the Forest Service is required to use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). The biological assessment must include "the view of recognized experts on the species at issue" to

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 35

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

determine whether or not formal consultation is required. 50 C.F.R. § 402.12(f)(2). The

Forest Service acts arbitrarily or capriciously if it entirely fails to consider an important

aspect of the problem, or offered an explanation either contrary to the evidence before

the agency or is so implausible as not to reflect either a difference in view or agency

expertise. *Motor Vehicle Mfs.*, 463 U.S. at 42.

Here, the Forest Service failed to consider the impacts to grizzly bears from road

densities in the Project area and failed to disclose road density calculations to the public.

Forest Service wildlife biologist Ann Glidden discloses:

> The Mission analysis area is heavily roaded, but opportunities for long
> term road closures are precluded by the management of the area for timber
> production, grazing and recreation, and need for access for fire
> suppression. I didn't see a value in trying to create large unroaded areas
> (core), given the timber, fire and rec use.

AR-08072.

As set forth above, it is well established that road density is an "important aspect

of the [grizzly bear recovery] problem." *Motor Vehicle Mfrs.*, 463 U.S. at 43. It is

undisputed that the best available science requires the Forest Service analyze the

Project's road density impacts on grizzly bears. The IGBC has established an "approach

to motorized access management between and within grizzly bear ecosystems." Akland

Dec., Ex. 5 at 1. Here, however, the Forest Service completely fails to consider road

density impacts on grizzly bears and does not apply any of the IGBC recommendations.

AR-15293-4. The Forest Service does not disclose an analysis of open road or total

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 36

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

road density within the female home range or any analysis unit. *Id*. In fact, no road density is disclosed in the context of grizzly bears in the Biological Assessment. Thus, without an analysis regarding the effects of open and total road densities prior to and following project implementation on grizzly bears, the Forest Services' effect analysis is inadequate because it fails to analyze an important aspect of the problem.

The Forest Service's failure to engage in this analysis or application here is a failure to fulfill its duty to evaluate the effects of the Project on grizzly bears as required by the ESA. The Biological Assessment offers no explanation as to why it deviates from its own established approach for motorized access effects on grizzly bears. Nor does the Biological Assessment articulate a rational connection between the undisputed best scientific information available, the Forest Service disclosure that "the Mission analysis area is heavily roaded," and the determination that the Project "will not likely adversely affect grizzly bears." In sum, Forest Service failed to apply the best available science and failed to consider an important aspect of the problem. Therefore, the Forest Service's "not likely to adversely affect" determination is arbitrary and capricious and violate the ESA. 16 U.S.C. § 1536(a)(2); *Motor Vehicle Mfrs.*, 463 U.S. at 43.

## V.    RELIEF

Based on the above described violations of law, setting aside the Final Decision and FONSI for the Mission Project (July 20, 2018) is warranted. Vacatur is the presumed remedy when an agency's action is found to be arbitrary, capricious, and/or

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.   (206) 264-8600
Fax.   (206) 264-9300

not in accordance with the law. *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be… arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law").

For purposes of 5 U.S.C. § 706, the phrase "set aside" means to vacate. *See, e.g., Checkosky v. S.E.C.*, 23 F.3d 452, 491 (D.C. Cir. 1994) ("Setting aside means vacating; no other meaning is apparent"). In turn, the APA's use of the word "shall" indicates that vacatur is the presumed, normal, or default remedy for improper agency action. *See, e.g., Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs,* 486 F.3d 638, 654 (9th Cir. 2007) (Under the APA, the normal remedy for an unlawful agency action is to 'set aside' the action. In other words, a court should vacate the agency's action and remand to the agency to act in compliance with its statutory obligations). *See also Klamath-Siskiyou Wildlands Center v. National Oceanic and Atmospheric Administration*, 109 F. Supp. 3d 1238, 1241 (N.D. Cal. 2015) ("When a court finds an agency's decision unlawful under the Administrative Procedures Act, vacatur is the standard remedy").

Vacating an agency's decision has the retroactive effect of restoring the status quo as if the decision had never been made. For example, when a Record of Decision has been vacated, the agency must then proceed as if it had never issued the ROD in the first place. *See Olympic Forest Coalition v. U.S. Forest Serv*., 556 F. Supp. 2d 1198,

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

1205 (W.D. Wash. 2008) (where the Forest Service's 2004 Record of Decision was vacated, the agency "was required to conduct [its new NEPA] analysis as if the . . . ROD had never been adopted"). *See also Envt'l Def. v. Leavitt,* 329 F.Supp. 2d 55, 64 (D.C. Cir. 2004) (holding that while EPA previously complied with a date-certain deadline for promulgating BART rules, vacatur of those rules "presented a situation wherein EPA had failed to promulgate regulations in accordance with the express deadline").

## VI. CONCLUSION

Plaintiff requests that the Court set aside the Mission Project Final Decision and FONSI pursuant to 5 U.S.C. § 706(2)(a) and 16 U.S.C. §1540(g) and enjoin implementation of the Project. Plaintiff seeks a declaratory judgment, injunctive relief, an award of costs and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412 and such other relief as this Court deems just and proper.

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

1    Dated this 10th day of July, 2020.

2                                    Respectfully submitted, by:

3                                    BRICKLIN & NEWMAN, LLP

4
                                         /s/ David A. Bricklin
5                                        /s/ Claudia M. Newman
                                         /s/ Zachary K. Griefen
6                                        David A. Bricklin, WSBA No. 7583
7                                        Claudia M. Newman, WSBA No. 24928
                                         Zachary K. Griefen, WSBA No. 48608
8                                        1424 Fourth Avenue, Suite 500
                                         Seattle, WA  98101
9                                        Telephone:  206-264-8600
                                         Facsimile:  206-264-9300
10                                       E-mail: bricklin@bnd-law.com
11                                       E-mail: newman@bnd-law.com
                                         E-mail: griefen@bnd-law.com
12

13                                   AKLAND LAW FIRM, PLLC

14                                       /s/ Kristine M. Akland
15                                       Kristine M. Akland, WSBA No. 53583
                                         P.O. Box 7274
16                                       Missoula, MT 59807
                                         Telephone: (406) 544-9863
17                                       E-Mail: aklandlawfirm@gmail.com

18                                       Attorneys for Alliance for the Wild Rockies

19

20

21

22

23

24

25

26

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 40

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300