FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

## Dec 01, 2020

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | No.   2:19-cv-00350-SMJ |
| Plaintiff, | **ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| UNITED STATES FOREST SERVICE, VICKI CHRISTIANSEN, Chief of the Forest Service, KRISTIN BAIL, Forest Supervisor for the Okanogan-Wenatchee National Forest Service, GLENN CASAMASSA, Regional Forester for Region 6 for the U.S. Forest Service, and UNITED STATES FISH AND WILDLIFE SERVICE, | |
| Defendants. | |

The Mission Restoration Project ("Mission Project" or "Project") encompasses about 50,200 acres of federal lands in the Methow Valley near Twisp, Washington. The Project primarily involves the Libby Creek and Buttermilk Creek drainage basins but also comprises a small portion of the Twisp River watershed. Over the past couple centuries, historical forest management practices like fire suppression, road building, and livestock grazing have led to a deterioration in

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 1

hydrologic function, aquatic habit, wildlife habitat, soil productivity, and vegetation composition, among other things. When combined with the continuing impacts of climate change, these past management practices have created hazardous forest conditions—from an increased risk for extreme wildfires to reduced instream flows. The Mission Project aims to restore the Libby and Buttermilk Creek landscapes to be more resilient to wildfire and climate change.

Plaintiff Alliance for the Wild Rockies ("Alliance") moves for summary judgment, challenging the Project on three grounds. First, it claims the Project is inconsistent with the Okanogan National Forest Land and Resource Management Plan, which violates the National Forest Management Act, 16 U.S.C. § 1600, *et seq.* It next argues the United States Forest Service's failure to prepare an environmental impact statement violates the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* Finally, it insists that the Forest Plan and the Mission Project violate the Endangered Species Act, 16 U.S.C. § 1531, *et seq.* Defendants United States Forest Service, Vicki Christiansen, Kristin Bail, and Glenn Casamassa ("Forest Service"), as well as United States Fish and Wildlife Service ("FWS") (collectively, "Defendants") disagree and cross-move for summary judgment.

For the reasons discussed below, this Court grants Defendants' cross-motion for summary judgment and denies Alliance's motion for summary judgment.

//

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 2

# BACKGROUND

The National Forest Management Act of 1976 ("NMFA") requires the Secretary of Agriculture ("Secretary") "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System" ("NFS"). 16 U.S.C. § 1604. The Secretary has promulgated several regulations which set out the planning requirements for developing, amending, and revising land management plans for NFS units. *See generally* 36 C.F.R. §§ 219.1–219.19.

In 1989, the Forest Service issued the Okanogan National Forest Land and Resource Management Plan and Final Environmental Impact Statement ("Forest Plan"). AR 00003.

> Plans . . . guide management of NFS lands so that they are ecologically sustainable and contribute to social and economic sustainability; consist of ecosystems and watersheds with ecological integrity and diverse plant and animal communities; and have the capacity to provide people and communities with ecosystem services and multiple uses that provide a range of social, economic, and ecological benefits for the present and into the future.

36 C.F.R. § 219.1(c). Still, "[a] plan may be amended at any time." 36 C.F.R. § 219.13(a). And "[p]lan amendments may be broad or narrow, depending on the need for change, and should be used to keep plans current and help units adapt to new information or changing conditions." *Id*.

In 2012, the Forest Service issued the Okanogan-Wenatchee National Forest Restoration Strategy ("Restoration Strategy"), a rigorous strategy for restoring the

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 3

sustainability and resiliency of forested ecosystems on the Okanogan-Wenatchee National Forest ("OWNF"). AR 16786. Many peer-reviewed scientific studies have shown that the OWNF is at risk for abnormally large and severe wildfires and insect outbreaks. U.S. Forest Service, *The Okanogan-Wenatchee National Forest Restoration Strategy: Adaptive Ecosystem Management to Restore Landscape Resiliency* (2012), https://www.fs.usda.gov/Internet/FSE_DOCUMENTS /stelprdb5340103.pdf. The Restoration Strategy thus developed a framework for integrated landscape evaluation and project development to help facilitate restoration of at-risk federal lands. *Id*.

Several interested stakeholders subsequently identified the Mission Project as an at-risk area requiring restoration within the OWNF. In particular, a diverse group of local stakeholders called the North Central Washington Forest Health Collaborative ("Forest Collaborative") partnered with the Forest Service during its early evaluation and project development phase. *See* AR 12325. The Forest Collaborative developed two documents in the National Environmental Policy Act ("NEPA") pre-scoping phase, which the Forest Service used to develop the proposed action: (1) the *Mission Landscape Prescription and Treatment Recommendations* and (2) the *Mission Aquatics Assessment Report*. U.S. Forest Service, Mission Restoration Project *Pre-Scoping*, (Apr. 18, 2016), https://www.fs.usda.gov/

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 4

project/?project=49201. The first report provided direction and targets for addressing deteriorating conditions and restoring more resilient landscapes in the Libby and Buttermilk watersheds; the second report provided a compilation of existing aquatics data and information for those watersheds. *See id*.

NEPA requires federal agencies to incorporate environmental considerations into their planning and decision-making through a systematic interdisciplinary approach. 42 U.S.C. § 4332. All federal agencies must prepare detailed statements assessing environmental impacts and alternatives to major federal actions significantly affecting the environment. *Id*. The President's Council on Environmental Quality ("CEQ"), which oversees NEPA, calls these statements Environmental Impact Statements ("EIS") and Environmental Assessments ("EA"). *E.g.*, 40 C.F.R. § 1501.3. CEQ has promulgated many regulations implementing NEPA's procedural provisions. *See generally* 40 C.F.R. §§ 1500–1508 (2018).[1]

In the spring of 2016, the Forest Service progressed to NEPA's scoping phase, proposing aquatic, soil, and vegetation restoration activities in the Mission

---

[1] Throughout this Order, this Court applies the NEPA regulations in effect at the time of final agency action in this case—when the Forest Service signed and published its Final Decision Notice and Finding of No Significant Impact on July 20, 2018. *See* AR 16786–16810. This Court recognizes that CEQ revised and replaced these regulations effective September 14, 2020. 40 C.F.R. §§ 1500–1506 (2020); Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,371 (July 16, 2020).

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 5

Project area. AR 08560–08567. The Forest Service issued the Mission Project scoping letter, inviting interested citizens and stakeholders to participate by providing comments. *Id*. It also conducted government-to-government consultations with the Confederated Tribes of the Colville Reservation and the Confederated Tribes and Bands of the Yakama Nation ("Yakama Nation"). AR 16794. All said, it received and responded to over 900 scoping comments while developing its preliminary EA.  AR 15785–16674; AR 16675–77.

The Forest Service made its preliminary EA for the Mission Project available for review in January 2017. AR 12447–869. That document proposed an amendment to the Forest Plan yet failed to assess how the amendment related to NFS land management planning regulations. AR 14745 (citing 36 C.F.R. 219.8–219.11). The Forest Service thus found the preliminary EA inadequate because the analyses for the Forest Plan amendments disregarded specific land management planning regulations. *Id*. It published a revised preliminary EA in June 2017, which provided the required regulatory analysis, but made no other substantive changes to the Mission Project. *Id*.; *see also* AR 13369–814.

The revised preliminary EA addressed the purpose and need for the Mission Project, alternatives considered but eliminated from detailed study, alternatives developed and a comparison of those alternatives, Forest Plan amendments, design criteria, mitigation measures, and monitoring. AR 13369–814. It also detailed

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 6

existing Project area conditions and any environmental consequences to water resources, soils, vegetation, fire and fuels, wildlife, transportation, botany, range, invasive species, recreation and scenic resources, air quality, economics, and other required disclosures. *Id.* The revised preliminary EA further listed agencies and persons consulted, including tribes, local governments, and individuals. *Id.* The Forest Service invited public comment and objections on the revised preliminary EA before issuing its final EA. *Id.*

Apart from its obligations under NFMA and NEPA, the Endangered Species Act ("ESA") requires the Forest Service (and other federal action agencies) to ensure that the actions it authorizes, funds, or carries out do not jeopardize the existence of any species listed under the ESA or destroy or adversely modify designated critical habitat of any listed species. *See* 16 U.S.C. § 1536(a)(2). To that end, Section 7 of the ESA obliged the Forest Service to consult with the National Oceanic and Atmosphere Administration's ("NOAA") National Marine Fisheries Service ("Fisheries") for marine species and FWS for terrestrial and freshwater species. *See id.*; *see also* § 1536(c)(1) (An action agency must inquire whether any threatened or endangered species "may be present" in the area of the proposed action). The Forest Service thus prepared a Biological Assessment of several species and their associated critical habitat, including upper Columbia River chinook salmon and steelhead, bull trout, northern spotted owl, Canada lynx, gray

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 7

wolf, wolverine, and grizzly bear. AR 15237–525. It then initiated informal consultation with FWS and NOAA Fisheries. AR 15528–29; AR 15530–31. Relevant here, it determined the Project "may affect" grizzly bear and requested FWS's concurrence with its "may affect, but not likely to adversely affect" determination. *See id.*

The Forest Service issued the Mission Project's final EA in March 2018. AR 14737. The final EA details the Forest Service's proposal to authorize landscape restoration, wildfire hazard reduction, and transportation system management activities in the OWNF Project area. AR 14745. The Forest Service intended the final EA to evaluate the Project area and prescribe and implement various treatments that rely on the principles of landscape and stand-level restoration ecology, wildfire hazard reduction, and transportation system management while complying with the amended Forest Plan and Restoration Strategy. AR 14746. The final EA provided a No Action Alternative and two Action Alternatives. AR 14765–68.

The Forest Service chose Action Alternative 2, as described in the final EA. AR 14713–36; *see also* AR 14737–15232. That alternative comprises various treatments designed to restore the Mission Project area, including both commercial and precommercial thinning (i.e., logging), prescribed fire, soil restoration, riparian habitat improvement and streambank stabilization, road maintenance and

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 8

decommissioning, culvert replacements, beaver habitat enhancement, and rock armoring, among other things. *Id.*

The Forest Service next issued a Draft Decision Notice and Finding of No Significant Impact ("FONSI"), determining that Action Alternative 2 will have no significant impact on the quality of the human environment considering the context and intensity of impacts under 40 C.F.R. 1508.27. AR 14713–36. It thus concluded it need not prepare an EIS. AR 14729. By letter, the Forest Service provided a legal notice about the opportunity to object to the final EA and Draft Decision Notice and FONSI.

Meanwhile, FWS issued a letter concurring that the Project "may affect" but is "not likely to adversely affect" any endangered or threatened species in the Project area. AR 15600–13. NOAA Fisheries also issued a letter concurring with the Forest Services' determination that the Project "may affect" but is "not likely to adversely affect" chinook salmon, steelhead, or their critical habitat. AR 15539–45. Germane to this case, FWS determined that the "[t]he likelihood of direct disturbance to grizzly bears is discountable due to their rareness, wide-ranging habitat use, and the tendency of this species to avoid areas with human activity." AR 15610. Moreover, the "potential for temporary displacement and minor habitat alteration in the Project area is likely to be insignificant to the survival, reproduction or distribution of the grizzly bear." AR 15610. FWS thus concurred with the Forest

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 9

Service's determination that the Project "may affect" but is "not likely to adversely affect" grizzly bears. AR 15613. FWS noted that the "Project should be reanalyzed if new information reveals effects of the action that may affect listed or proposed species or designated or proposed critical habitat in a manner or to an extent not considered in this consultation." AR 15613.

After the objection period closed, the Forest Service issued its Final Decision Notice ("DN") and FONSI. AR 16786. The DN/FONSI details the Forest Service's decision and rationale, including selecting a slightly modified version of Action Alternative 2. *Id*.

Alliance sued. ECF Nos. 1, 8. The First Amended Complaint alleges that the Project will have significant adverse impacts on water resources, fish, vegetation, soils, and wildlife. ECF No. 8. It also alleges that the final EA fails to adequately analyze cumulative environmental impacts and relies on delayed and uncertain mitigation measures. *Id*. Alliance claims that Defendants violated NFMA and the Administrative Procedure Act ("APA") by flouting the Forest Plan. *Id*. It contends that Defendants violated NEPA and the APA by failing to prepare an EIS and adequately analyze environmental impacts. *Id*. And it finally asserts Defendants violated the ESA and the APA by failing to analyze Project impacts on Columbia river bull trout and failing to reinitiate formal consultation on the Forest Plan's impacts on grizzly bears. *Id*. Alliance seeks declaratory and injunctive relief, as well

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 10

as an award of costs and attorney fees. *Id*.

Alliance moved for summary judgment. ECF No. 19. Defendants responded and cross-moved for summary judgment. ECF No. 20. Alliance responded to Defendants' cross-motion, ECF No. 37, and Defendants replied, ECF No. 38.

The Yakama Nation and several conservation groups filed amicus briefs supporting the Mission Project. ECF Nos. 22, 23, 24 & 27. In these briefs, the Yakama Nation, the Forest Collaborative, Conservation Northwest, Methow Valley Citizens Council, the Wilderness Society, and Chelan County emphasize the thorough level of scientific and environmental review; amici also stress the substantial forest and watershed restoration actions as their main reasons for supporting the Mission Project. *See generally id*.

On November 10, 2020, this Court conducted a hearing on the parties' cross-motions for summary judgment. At the close of the hearing, the Court took the parties' motions under advisement.

## STANDARD OF REVIEW

Courts must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could affect the suit's outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if a reasonable jury could find for the nonmoving

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 11

party based on the undisputed evidence. *Id.* The moving party bears the "burden of establishing the nonexistence of a 'genuine issue.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Id.* Still, when a case involves reviewing a final agency determination under the APA, courts generally need not perform any fact-finding. *Nw. Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994). As this Court must confine the scope of its review to the administrative record, it finds this case ripe for resolution by summary judgment.

## REVIEW UNDER THE APA

This Court reviews the Forest Service's compliance with NFMA, NEPA, and the ESA under the APA. *All. for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1242 (9th Cir. 2017); *see also* 5 U.S.C. §§ 701, 704. This Court will set aside (i.e., vacate) a final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1032 (9th Cir. 2020); *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) (reiterating "remand, along with vacatur, is the presumptively appropriate remedy for a violation of the APA.").

"Review under the arbitrary and capricious standard is narrow, and [the

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT – 12

court] not substitute [its] judgment for that of the agency." *Oregon Nat. Desert*, 957 F.3d at 1032 (9th Cir. 2020) (alteration added) (citation and quotation marks omitted). Courts will find

> an agency action as arbitrary and capricious 'if the agency [1] has relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] [if the agency's decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 1033 (numbering added) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Still, "[a]n agency decision will be upheld as long as there is a rational connection between the facts found and the conclusions made." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011).

## DISCUSSION

### A.    National Forest Management Act

To begin with, Alliance claims this Court should vacate the Mission Project, arguing it is inconsistent with Forest Plan Standards and Guidelines on deer habitat, snowplowing, and soil compaction. ECF No. 19 at 19–27. This Court disagrees.

#### 1.    Legal Framework

NFMA establishes a three-tier system which governs forest management actions. *See Citizens for Better Forestry v. United States Dep't of Agric.*, 341 F.3d

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 13

961, 965 (9th Cir. 2003) (citing 16 U.S.C. §§ 1601–1687). At the national level, the Secretary of Agriculture promulgates regulations, which govern regional and local forest management plans and require compliance with NEPA. *Id.* (citing 16 U.S.C. § 1604(g)). At the regional level, the Forest Service develops "land and resource management plans" (or forest plans), which govern the management of forest regions. *Id.* at 966. Finally, at the "site-specific" level, the Forest Service designs and implements site-specific actions, which must be consistent with both the national regulations and the regional forest plan. *Id.*; 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans.").

This Court will defer to the Forest Service's interpretation of its Forest Plan when it is "susceptible to more than one meaning unless the [Forest Service's] interpretation is plainly erroneous or inconsistent with the [Forest Plan]." *See Native Ecosystems Council v. Marten*, 883 F.3d 783, 793 (9th Cir. 2018) (quoting *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 555, 555 n.9 (9th Cir. 2009) (holding courts must apply *Auer* deference to the Forest Service's interpretation of its land and resource management plans).

### 2.    Deer Habitat

The Forest Plan divides the OWNF into Management Areas ("MAs"), each with different management goals, resource potential, and limitations. AR 01670.

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 14

The Forest Plan also provides prescriptions for each MA, composed of a goal statement, description, desired future condition, activities, and Standards and Guidelines. *Id.*

Prescription 26 corresponds to MA 26, which has a goal of managing "deer winter range and fawning habitats to provide conditions which can sustain optimal numbers of deer indefinitely, without degrading habitat characteristics such as forage, cover, and soil." AR 01687. The Forest Service's desired future condition for MA 26 states, in part:

> Deer winter ranges will be managed to provide optimum habitat conditions for deer by maintaining well distributed winter thermal and snow/intercept thermal cover and foraging areas. Wood product outputs will be provided at a reduced level. Winter recreation activities will be encouraged outside of deer winter range. Access to these areas will be provided on designated through routes to reduce disturbance to wintering deer. Motorized access will be restricted to maintain wildlife habitat effectiveness at higher levels.

*Id.* The Standards and Guidelines ("Standards") governing "Timber Planning" in MA 26 provide: "Scheduled and non-scheduled timber harvests shall be designed to perpetuate deer habitat and to address current habitat needs." AR 01688. The Standards governing "Sale Preparation" provide:

> Operating season for logging and post sale operations shall be restricted when necessary to protect roads, soil, water, deer winter range, and fawning areas. To protect deer during winter, operations shall be prohibited December through March except east of the Okanogan River. Logging and post sale operations shall be limited to protect

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 15

1    fawning during June.

2    AR 01689. As for "Roads," the Standards provide: "Winter haul may be permitted

3    provided the goals of the management area are met." *Id*.

4        Alliance argues the Mission Project contravenes these Standards because the

5    EA provides that "commercial thinning would be required under winter conditions

6    in some areas to prevent further soil disturbance. Winter soil conditions allow for

7    protection of detrimentally impacted soils from past management while allowing

8    the area to be thinned by mechanized harvesters to achieve project goals." ECF No.

9    19 at 23 (quoting AR 14840). Alliance also challenges the DN/FONSI, which notes:

> Proposed commercial thinning and slash treatments is planned to be
> completed in two Stewardship contracts. The first contract of
> commercial thinning treatments with associated fuels treatments will
> remove trees from the Libby Creek drainage, about 6 MMBF. Much
> of this contract will likely be winter harvested. The second contract
> will remove trees from the Buttermilk Creek drainage, about 2 MMBF.
> Most of the units in this second contract could be harvested in either
> summer or winter.

15    AR 16788. Alliance contends that because the Mission Project proposes

16    commercial and noncommercial thinning west of the Okanogan River during the

17    winter, and because it relies explicitly on winter logging to protect soils, the Project

18    violates the Standards discussed above. ECF No. 19 at 24. This Court finds these

19    arguments unpersuasive.

20        First, the final EA details the Standards governing MA 26. AR 15199–200.

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT – 16

It also notes MA 26 comprises only 2 percent of the total Project area. AR 14751. Even so, to meet the purpose and needs identified in the final EA, the Forest Service recognized that commercial tree thinning would reduce deer winter range cover below Standard MA26-6A, thus requiring a Project-specific amendment. AR 14917. The regulations promulgated by the Secretary of Agriculture provide that "[a] plan may be amended at any time." 36 C.F.R. § 219.13(a). The DN/FONSI emphasizes that the final EA is consistent with the Forest Plan except where amended for deer winter range by its decision. AR 16789; AR 16796–801.

The Standards provide logging, and post-sale operations, must be limited only "*when necessary* to protect . . . deer winter range." AR 01689 (emphasis added). Yet the Standards also allow winter haul when "the goals of the management area are met." AR 01689. The Mission Project Wildlife Resources Report[2] discusses the impacts on winter range for mule deer in detail, including MA 26, and concludes "that the goals of the management area would be met despite winter operations in deer winter range." *See* AR 14485–87. It also underscores that "[t]he project would improve conditions for mule deer in the project area, because it will increase forage and reduce open road density, despite minor disturbance on

---

[2] The Mission Restoration Project Wildlife Resources Report by A. Glidden (2017) (Amended by Rohrer, 2018) is incorporated by reference in the final EA. *See* AR 14921; AR 14458–549.

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 17

winter range." AR 14521. The final EA likewise provides a detailed consistency statement addressing the impacts on deer winter range. AR 14970–75. It stresses that "[f]uels treatments would provide for the retention and/or enhancement of key wildlife habitat wherever practicable by increasing forage available for deer and by reducing the risk of widespread loss of habitat from uncharacteristic wildfire behavior." AR 14917.

While the Standards governing "Sale Preparation" "prohibit[] [logging in MA 26] December through March except east of the Okanogan River," AR 01689, neither the final EA nor DN/FONSI specifically state that the Forest Service plans to conduct "Sale Preparation" activities or to grant contracts for commercial thinning on MA 26 during that period. Alliance has presented no disputed material fact like a permit, contract, or other instrument showing that the Forest Service explicitly plans logging and post-sale operations on MA 26 during the prohibited period. *See* 16 U.S.C. § 1604(i). As a result, Alliance has shown no inconsistency with the Forest Plan Standards outlined above. *See id*. Nor has it shown precluding the Project is "*necessary* to protect . . . deer winter range." *See* AR 01689 (emphasis added).

In sum, Alliance has not shown the Forest Service acted arbitrarily and capriciously under the APA. *See* 5 U.S.C. § 706(2)(A). On the contrary, the Forest Service provided a thorough analysis and emphasizes the Project will improve deer

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 18

habitat over the long term. This Court's "[r]eview under the arbitrary and capricious standard is narrow," and it will not substitute its "judgment for that of the agency." *See Oregon Nat. Desert*, 957 F.3d at 1032. This Court finds the Forest Service's analysis of MA 26, including impacts on the deer winter range, consistent with the Forest Plan. *See* 16 U.S.C. § 1604(i).

### 3. Snowplowing

Alliance next claims the Project is inconsistent with Standards that bar snowplowing Forest Road 43. ECF No. 19 at 24. But Alliance failed to raise this allegation in its First Amended Complaint, and it may not raise such a claim for the first time in its summary judgment motion.

The Forest Service first argues that parties challenging administrative decisions must structure their participation to alert the agency to the parties' position and contentions to allow the agency to give the issue meaningful consideration. ECF No. 20 at 22 (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) and *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1208 (9th Cir. 2004)). It points out that Alliance did not object to the snowplowing standards during the NEPA comment period. *See id.* Even so, the Forest Service's reliance on *Public Citizen* and *City of Sausalito* appears misplaced. Those cases address challenges under NEPA, and it is unclear whether that reasoning applies outside the

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 19

NEPA context.[3] But this Court need not decide whether this reasoning extends to NFMA challenges under 16 U.S.C. § 1604(i) because Alliance's argument is not properly before the Court.

Alliance clearly challenges the Mission Project's consistency with the Forest Plan under NFMA, and it failed to raise this issue in its First Amended Complaint. *See* ECF No. 8. Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The complaint need not provide "detailed factual allegations," but it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs must plead enough facts "to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

Ninth Circuit "precedents make clear that where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such claim in

---

[3] *Public Citizen* and *City of Sausalito* in turn rely on cases that address challenges in the NEPA context. *See, e.g.*, *City of Angoon v. Hodel*, 803 F.2d 1016, 1022 (9th Cir. 1986) (quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978) ("[I]t is true that NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions.").

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 20

a summary judgment motion is insufficient to present the claim to the district court." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008); *see also Pac. Coast Fed'n of Fishermen's Associations v. Glaser,* 945 F.3d 1076, 1086–87 (9th Cir. 2019); *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006). Alliance never mentions its snowplowing claims in its First Amended Complaint. *See* ECF No. 8.

For these reasons, Alliance's snowplowing claims are not properly before this Court on summary judgment.

### 4.    Soil Compaction

Alliance finally claims the Forest Service failed to establish compliance with the Forest Plan's soil compaction limit in violation of NFMA. ECF No. 19 at 25–27. Yet this final claim under NFMA also fails.

The Forest Service generally defines "detrimental soil disturbance" ("DSD") as a combination of compaction, puddling, rutting, burning, erosion, and displacement. *See generally* AR 14421–24. Under the "Management" heading, Standard 13-10 governing "Soil and Water" provides: "Ground yarding systems shall be restricted to meet Regional guidelines for soil compaction, displacement, and puddling. *No more than 15 percent of an area* shall be in a puddled, displaced, or compacted condition following completion of management activities." AR 01626 (emphasis added). The Soil Resource Report ("Soil Report") prepared for

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 21

the Mission Project notes, "[s]oil standards are built into Forest Plans." AR 14421. The Forest Service Manual establishes the framework for sustaining soil quality and hydrologic function; the Region 6 Supplement designs and implements management practices, which maintain or improve soil and water quality. *Id*.

Alliance argues the Forest Service improperly relied on an "average" DSD for the entire Project area rather than assessing each treatment unit's soil conditions. ECF No. 19 at 26 (citing AR 14838). But Alliance misreads the Soil Report and final EA.

First, "[s]oils and landforms vary across the project area." AR 14426. In the spring of 2015 and 2016, a professional soil scientist assessed each proposed treatment unit. AR 14423. The soil scientist field reviewed these treatment units using walkthrough surveys. *Id*. The surveys identified past management activities that have produced persistent DSD. *Id*. These past activities include, for example, timber harvesting, grazing, road construction, recreation, shake mills, and fires. AR 14427. Current DSD levels in the analysis area stem mostly from these past activities and form the foundation of soil conditions today. *Id*.

The final Soil Report section covering methodology highlights, "[t]he analysis area for soils encompasses all land within an individual treatment unit." AR 14830. It measures soil disturbance, including compaction, rutting, and puddling, as percentages for each unit. AR 14831. Critically, it notes, "DSD was

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 22

identified in 40 of the proposed commercial treatment units. Existing DSD is within soil quality standards for 26 units and 14 units are at or very near soil management guidelines. DSD was not identified in the remaining 31 treatment units." AR 14426. The Forest Service calculated existing soil conditions in the 74 treatment units within the project area using the Forest Soil Disturbance Monitoring Protocol and Region 6 soil monitoring protocols. AR 14428–29.

The Region 6 Supplement to Forest Service Manual 2500 outlines added policy to maintain or improve soil and water quality. It provides "[i]n areas where less than 20 percent detrimental soil conditions exist from prior activities, the cumulative detrimental effect of the current activity following project implementation and restoration must not exceed 20 percent." AR 14421 "In areas where more than 20 percent detrimental soil conditions exist from prior activities, the cumulative detrimental effects from project implementation and restoration must, at a minimum, not exceed the conditions prior to the planned activity and should move toward a net improvement in soil quality." AR 14421. The Soil Report concludes,

> Alternative 2 will produce additional soil disturbance that overlaps in time and space with the existing soil conditions. This disturbance will be minor to moderate immediately after project implementation, but soil BMPs will facilitate these impacts are short-term. Activities such as sub-soiling will have an immediate minor affect to the treated areas, but there is a long-term benefit of de-compacting these soils and reestablishing proper soil functioning such as water infiltration, soil

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 23

biological function, and native plant communities (Archuleta et al 2006). Future wildfires, OHV use, firewood gathering, and road maintenance activities are the most likely on-going and reasonably foreseeable actions that would cumulatively affect soil resources in treatment units. Mitigations and rehabilitation will insure Alternative 2 meets the Okanogan-Wenatchee Forest Plan and Region 6 standards and guidelines.

AR 14449. The Report finally emphasizes, "No units will exceed the Region 6 standards and guidelines for soil quality in Alternative 2." AR 14450.

The final EA reflects these findings. AR 14833–34. It details each alternative's environmental consequences, AR 14836–44, and provides a detailed consistency statement of compliance with the Forest Plan and other relevant laws, regulations, policies, and plans. AR 14844–45. The Forest Service determined that "[t]he proposed actions, design criteria, and mitigation measures are in compliance with the [Forest Plan] standards and guidelines 13-9 and 13-10 by reducing the amount of soil displacement, compaction, and puddling." AR 14844.

Alliance argues because the Forest Service calculated the average existing DSD in each treatment unit at four to seven percent, and under either action alternative the average DSD in each treatment unit will increase to seven to ten percent, "it's likely that there will be timber units that exceed the 15% limit following the completion of management activities within the Mission Project." ECF No. 19 at 26. Without evidence, Alliance seems to ask the Court to extrapolate from the data a post-Project DSD percentage—in unspecified treatment units—

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 24

exceeding the fifteen percent limit provided in the Forest Plan. Yet the Forest Service determined that each treatment unit's average DSD will remain below the fifteen percent limit under either action alternative. *See* AR 14838. This Court will neither speculate nor make unsupported extrapolations. It will defer to the Forest Service's calculation that the average DSD in each treatment unit will remain below the fifteen percent limit imposed by Standard 13-10.

To summarize, the Forest Service has shown the Mission Project's consistency with the Forest Plan, and Alliance has not shown the Forest Service acted arbitrarily and capriciously under the APA. *See* 5 U.S.C. § 706(2)(A). The Forest Service conducted a thorough soil analysis and incorporated these findings in its final EA. It concluded the Mission Project will have "long-term, beneficial, moderate impacts on soil compaction in the identified areas," AR 14843, and the Project complies with the Forest Plan's Standard 13-10. AR 14844. Again, this Court's "[r]eview under the arbitrary and capricious standard is narrow," and it will not substitute its "judgment for that of the agency." *See Oregon Nat. Desert*, 957 F.3d at 1032. It therefore finds the Forest Service's soil analysis consistent with the Forest Plan under 16 U.S.C. § 1604(i).

**B.    National Environmental Policy Act**

Turning to Alliance's claims under NEPA, Alliance maintains the Forest Service violated NEPA by failing to prepare an EIS. ECF No. 19 at 27. It did not.

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 25

### 1.    Legal Framework

"NEPA is a procedural statute that requires the federal government to carefully consider the impacts of and alternatives to major environmental decisions." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018) (quoting *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012)). NEPA "has twin aims." *Id.* "'First, it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process.'" *Id.* (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002)). "'NEPA requires agencies to take a 'hard look' at the environmental consequences of proposed agency actions before those actions are undertaken.'" *Id.* (quoting *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1215 (9th Cir. 2017)).

Under NEPA, an action agency must prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). But an action agency must first identify whether it may categorically exclude the proposed action from further analysis by determining if it will have no significant effect on the human environment. 40 C.F.R. § 1501.4(b). "If the agency cannot categorically exclude the proposed action, the agency shall prepare an [EA]

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 26

or [EIS]." *Id*. § 1501.4(b)(2).

An EA is "a concise public document" that serves to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1508.9(a)(1). If the agency finds no significant impact associated with a proposed project, it may issue a FONSI rather than prepare an EIS. 40 C.F.R. § 1508.13. The key term here is "significantly." *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006). "Whether a project is 'significant' depends on the project's 'context' and its 'intensity.'" *Id*. (quoting 40 C.F.R. § 1508.27). "Context refers to the scope of the action, while intensity refers to the severity of the impact." *Id*. CEQ regulations outline ten intensity factors. *See* 40 C.F.R. § 1508.27(b).

### 2.    Mitigation Measures

Alliance claims the Forest Service improperly relied on delayed and uncertain mitigation and beneficial impacts to justify its DN/FONSI. ECF No. 19 at 27–32. This Court disagrees.

"NEPA does not require a fully developed plan detailing what steps *will* be taken to mitigate adverse environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989). And this Court is mindful "that NEPA does not *require* that [EAs] include a discussion of mitigation strategies." *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1147 (9th Cir. 2000). "Although

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 27

NEPA regulations do require a discussion of the '[m]eans to mitigate adverse environmental impacts,' 40 C.F.R. § 1502.16(h), this provision governs the preparation of an [EIS], not an [EA]." *Id.* (alteration added). That said, while an action agency may "'consider the effect of mitigation measures in determining whether preparation of an EIS is necessary,'" *All. for the Wild Rockies*, 865 F.3d at 1222 (quoting *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir. 1993)), it "cannot rely on monitoring and mitigation alone in reaching a FONSI." *Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 999 (9th Cir. 2013).

An action agency relying on mitigation measures to reach a FONSI may either (1) analyze "potential impacts of a proposed action and then develop[] a plan to mitigate those adverse effects," or (2) "incorporate[] mitigation measures throughout the plan of action, so that the effects are analyzed with those measures in place." *Env't Prot. Info. Ctr.*, 451 F.3d at 1015. When an agency chooses the latter method, "it cannot be said that the EA fails to analyze the effects of the mitigation measures; instead, the EA analyzes the [p]roject under the enumerated constraints and concludes that any environmental impacts will not be significant." *Id.*

Here, the Forest Service incorporated mitigation measures throughout the Project's design and analyzed the proposed action alternatives' environmental

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 28

impacts with those measures in place. *See* AR 14763–84. Indeed, it provided a specific, detailed assessment of its plans to mitigate those impacts. AR 15118–51. Alliance does not challenge the Forest Service's specific mitigation measures nor its analysis; instead, it maintains that the Forest Service cannot rely on these mitigation measures to support its FONSI because inadequate funding might delay or preclude implementation. ECF No. 19 at 30–32. But Alliance fails to show how the Project, including its related mitigation measures, will "significantly affect[] the quality of the human environment." *See* 42 U.S.C. § 4332(2)(C). Though Alliance argues "[t]he conclusions of the Forest Supervisor with respect to the factors in 40 CFR § 1508.27 (see AR-16802-16805) were incorrect and did not accurately reflect the summary and analysis in the Environmental Assessment," it neglects to address these factors or show how the Project's context and intensity creates significance under 40 C.F.R. § 1508.27. Finally, as Defendants suggest, it appears Alliance conflates the Project's restoration objectives with the notion of environmental impact mitigation. *Compare* ECF No. 19 at 30–32 *with* ECF No. 20 at 31–35. This Court finds the Forest Service adequately analyzed the Project under the specified constraints and reasonably determined that its measures will mitigate any environmental impacts to the point of no significance. *See Env't Prot. Info. Ctr.*, 451 F.3d at 1015.

Alliance cites *Wyo. Outdoor Council Powder River Basin Res. Council v.*

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 29

*U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1250 (D. Wyo. 2005), *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998), *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935–36 (9th Cir. 2008), the Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026 (1981), and *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982) to support its argument. This Court will briefly address each authority in turn.

*Wyoming Outdoor Council* involved a challenge to a decision by United States Army Corps of Engineers to issue a general permit under the Clean Water Act. 351 F. Supp. 2d 1232. The court observed that mitigation measures "must be imposed by statute or regulation or have been so integrated into the initial proposal that it is impossible to define the proposal without the mitigation." *Id*. at 1250. There, "the mitigation measures [were] a mandatory condition to the use of [General Permit] 98–08." *Id*. It also observed that when an agency relies on mitigation measures, it "may use those measures as a mechanism to reduce environmental impacts below the level of significance that would require an EIS," yet it must support the proposed mitigation with substantial evidence in the record. *Id*. The court determined that "the mitigation measures relied upon by the Corps, while mandatory, [were] not supported by a single scientific study, paper, or even a

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 30

comment," and, therefore, "the Corps was arbitrary and capricious in relying on mitigation to conclude that there would be no significant impact to wetlands." *Id*. at 1252.

In contrast, Alliance has identified no statute or regulation requiring the Forest Service to consider mitigation measures while developing and implementing the Mission Project. Assuming the mitigation measures have been so integrated into the Project that it would be impossible to define the proposal without the mitigation, this Court finds the Forest Service supported its mitigation measures with substantial evidence in the record.

In *Cuddy Mountain*, the agency found the proposed agency action—a timber sale—would significantly affect the quality of the human environment by increasing sedimentation in three creeks. 137 F.3d at 1380. The court determined, "[h]aving so found, the Forest Service was obligated to describe what mitigating efforts it could pursue to off-set the damages that would result from the sale." *Id*. (citing 40 C.F.R. § 1502.16(h) (an EIS "shall include discussions of . . . [m]eans to mitigate adverse environmental impacts"). As stated above, NEPA does not require EAs to discuss mitigation measures. *Akiak Native Cmty.*, 213 F.3d at 1147. The regulation addressed in *Cuddy Mountain*—40 C.F.R. § 1502.16(h)— governs the preparation of an EIS, not an EA. *Compare id. with Cuddy Mountain*, 137 F.3d at 1380. This case involves an EA and the Forest Service did not find the Mission

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 31

Project would cause significant environmental impacts, so Alliance's reliance on *Cuddy Mountain* is misplaced.

*National Wildlife Federation* similarly does not apply. *See* 524 F.3d at 935–36. That case involved a different statutory regime altogether—mitigation in the ESA context—and does not even mention NEPA. *See id.* This Court finds it irrelevant in the context at issue here.

Finally, in *Cabinet Mountains Wilderness*, the court noted:

> NEPA's EIS requirement is governed by the rule of reason, and an EIS must be prepared only when significant environmental impacts will occur as a result of the proposed action. If, however, the proposal is modified prior to implementation by adding specific mitigation measures which completely compensate for any possible adverse environmental impacts stemming from the original proposal, the statutory threshold of significant environmental effects is not crossed and an EIS is not required.

685 F.2d at 682 (citation omitted). The court held, "[b]ecause the mitigation measures were properly taken into consideration by the agency, we have no difficulty in concluding that the Forest Service's decision that an EIS was unnecessary was not arbitrary or capricious." *Id.* at 683. This case is like *Cabinet Mountains Wilderness* and fails to buttress Alliance's argument. Here, the record similarly shows that the Forest Service considered the Mission Project proposal, identified the potential environmental impacts, weighed those impacts, and found the mitigation measures would reduce any environmental impacts to the point of no

significance. *See id*.

As for Alliance's reliance on CEQ's Forty Questions publication, this Court agrees that the Forty Questions publication is simply "an informal statement, not a regulation," and finds it unpersuasive. *See Cabinet Mountains*, 685 F.2d at 682.

### 3.    Environmental Impact on Soil

Alliance next contends the final EA fails to provide a convincing statement of reasons to support the DN/FONSI for soil disturbance impacts. ECF No. 19 at 32–35. But the Forest Service's analysis was fully informed and well considered, so this Court will defer to its decision.

NEPA requires an action agency to take various procedural steps but it does not require an agency to reach any particular result. *Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029, 1035 (9th Cir. 2019). "If an agency decides not to prepare an EIS, it must supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988)). "The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Id*. (quoting *Save the Yaak*, 840 F.2d at 717). This Court will defer to an agency's decision if it is "fully informed and well considered," *Save the Yaak*, 840 F.2d at 717, but "will disapprove of an agency's decision if it made a clear

error of judgment." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1023 (9th Cir. 2007) (citations and internal quotation marks omitted).

The Soil Report defines soil impact intensities using four categories: negligible, minor, moderate, and major. AR 14423–24. As for compaction, rutting, and puddling, the Forest Service found choosing the No Action Alternative "would continue the *long-term, adverse, major* impacts on soil compaction in the identified areas." AR 14431 (emphasis added). By comparison, the Forest Service found choosing Action Alternative 2 "will result in *adverse, short-term, minor* detrimental soil compaction, rutting, and puddling from management activities." AR 14440 (emphasis added). Overall, it found the Project will have "*long-term, beneficial, moderate* impacts on soil compaction in the identified areas." AR 14843 (emphasis added).

Alliance argues these findings are arbitrary and capricious. ECF No. 19 at 33–35. Under the No Action Alternative, the average existing DSD in each treatment unit equals about four to seven percent. *Id*. Under either proposed action alternative, the average DSD in each treatment unit will increase to seven to ten percent. *Id*. So, "[a] conclusion that soil disturbance of 4-7% is 'major,' while soil disturbance that is 7-10% is 'minor' is simply not credible and clearly arbitrary and capricious." *Id*. at 34. It claims a final determination of "long-term, beneficial, *moderate* impacts" makes no sense given the above. *Id*. (emphasis added). And it

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 34

further claims the findings are not credible considering that the analysis shows that the adverse soil compaction impacts increase in intensity under either action alternative. *Id*.

Despite Alliance's claims, the Forest Service calculated the precise DSD existing in each proposed treatment unit—it did not simply take an average. *See* AR 14428–29. It found the No Action Alternative "would continue the *long-term, adverse, major* impacts" because the "current soil compaction in 14 units exceeds R6 soil standards."[4] AR 14431 (emphasis added). It stresses that "[t]he No Action alternative would do nothing to reduce the long-term legacy [i.e., existing] compaction found in the project area." *Id*. And it determined that "[t]he existing compaction of *major* intensity from past land use is of greater concern" than either proposed action alternative. AR 14440. "These units have soil compaction conditions that [currently] limit water infiltration and storage in the soil profile, promotes invasive plant species while reducing native vegetation from poor soil conditions, and reduced nutrient cycling due to organic matter reduction from poor plant growth." *Id*.

---

[4] The term *major* in this context means: "Impacts to soil productivity are visible/measurable, *rutting and compaction exceeds R6 standards*, complete or near complete loss of organic matter layer, visible erosion and have measureable impacts decades after project implementation. These types of soil impacts will not sustain a diverse plant community, but rather a monoculture of non-native plants or no plant growth at all." AR 14424 (emphasis added).

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 35

In contrast, Action Alternative 2 "will result in *adverse, short-term, minor* detrimental soil compaction" based largely on the Project's proposed commercial thinning activities. AR 14440. Still, the Forest Service notes, "if soil BMPs [best management practices] are implemented new compaction would be *minor*." *Id.* (emphasis added). And "Alternative 2 will produce additional soil disturbance that overlaps in time and space with the existing soil conditions." AR 14449. Because "[b]oth action alternatives (2 & 3) would allow for subsoiling activities to alleviate *major* soil compaction from historic[al] land use," these alternatives will allow "for increased water infiltration, increased soil biological activity, and a better growing medium for native plants." AR 14445 (emphasis added). For these reasons, the Forest Service determined that although Action Alternative 2 "will result in *adverse, short-term, minor* detrimental soil compaction," the Project will overall have "*long-term, beneficial, moderate* impacts" because the "subsoiling activities [will] alleviate *major* soil compaction from historic[al] land use." AR 14440; AR 14445 (emphasis added). After closely reading the Soil Report, final EA, and DN/FONSI, this Court finds the Forest Service provided a convincing statement of reasons. This Court will thus defer to the Forest Service's decision to implement Action Alternative 2 because it is fully informed and well-considered. *See Save the Yaak*, 840 F.2d at 717.

In sum, this Court concludes that the Forest Service did not act arbitrarily and

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 36

capriciously, abuse its discretion, or otherwise act contrary to the law when it decided not to prepare an EIS. *See* 5 U.S.C. § 706(2)(A). It took the requisite "hard look" at the Project's environmental impacts and provided various mitigation measures to effectively reduce those impacts to the point of no significance. *See*, *e.g.*, *Blue Mountains*, 161 F.3d at 1212. And it specifically addressed the environmental impacts the Project will have on soils and found it will have "long-term, beneficial, moderate impacts on soil compaction in the identified areas." AR 14843. This Court will not intrude upon "the administrative process" by substituting its judgment for that of the Forest Service. *See Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 987 (9th Cir. 1985).

## C.    Endangered Species Act

Lastly, Alliance argues that the Forest Plan and the Mission Project violate the ESA. ECF No. 19 at 35–49. It claims that the Forest Service must reinitiate consultation on the Forest Plan because of possible grizzly bears in the Project area. *Id*. at 39. It also claims the Forest Service acted arbitrarily and capriciously by allegedly failing to disclose and analyze how road density affects possible grizzly bears in the Project area.[5] *Id*. at 45. Defendants cross-move for summary judgment,

---

[5] In its First Amended Complaint, Alliance alleges Defendants violated the ESA with regard to Columbia river bull trout. ECF No. 8. Yet its opening motion for summary judgment failed to address that allegation. ECF No. 19. This Court finds

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 37

arguing (1) Alliance lacks standing, (2) Defendants need not reinitiate consultation, (3) no grizzly bears inhabit the Project area, and (4) they adequately considered and analyzed the Mission Project's road-related impacts on grizzly bears. ECF No. 42–58.

### 1.    Legal Framework

Under Section 7(a)(2) of the ESA,

> [e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of Commerce or the Interior] insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [the critical] habitat of such species.

16 U.S.C. § 1536(a)(2). If listed species or designated critical habitat "may be present in the area," the action agency must "conduct a biological assessment for the purpose of identifying any endangered species or threatened species" that may be affected by the proposed action. *Id*. § 1536(a)(2). "A biological assessment shall evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary." 50 C.F.R. § 402.12(a).

---

Alliance has waived this argument. *See, e.g.*, *Friends of Yosemite Valley*, 520 F.3d at 1033 ("Arguments not raised by a party in its opening brief are deemed waived.").

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 38

1  "The contents of a biological assessment are at the discretion of the Federal agency

2  and will depend on the nature of the Federal action." *Id*. § 402.12(f). "If

3  the biological assessment indicates that there are no listed species or critical

4  habitat present that are likely to be adversely affected by the action and the Director

5  concurs . . ., then formal consultation is not required." *Id*. § 402.12(k)(1).

6     ESA regulations require an action agency to reinitiate consultation only when

7  "discretionary Federal involvement or control over the action has been retained or

8  is authorized by law." 50 C.F.R. § 402.16(a). A party seeking reinitiation must also

9  establish at least one of four possible conditions. *Id*. § 402.16(a)(1)-(4). For

10  example, "[i]f new information reveals effects of the action that may affect listed

11  species or critical habitat in a manner or to an extent not previously considered,"

12  the action agency or services must reinitiate consultation. *Id*. § 402.16(a)(2).

13     **2.    Standing**

14     Defendants first challenge Alliance's standing to raise its ESA claims. ECF

15  No. 20 at 42–46. More specifically, they claim Alliance has shown no injury in fact.

16  *See id*. In response, Alliance reiterates it has Article III standing under the ESA and

17  provides two declarations in support. ECF No. 37 at 16–18; ECF No. 37-1; ECF

18  No. 37-2. In reply, Defendants appear to concede Alliance's second declarations

19  cured whatever standing concerns they had or at least do not reiterate their standing

20  argument and address the merits of Alliance's claims. *See* ECF No. 38 at 8–11.

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT – 39

In any event, "Article III, § 2 of the Constitution states that the federal courts may only adjudicate 'cases' and 'controversies,' and thus imposes what the Supreme Court has called 'the irreducible constitutional minimum of standing.'" *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 946 (9th Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "To establish Article III standing, Alliance must show (1) an injury in fact, which is an injury that is concrete and particularized, and actual or imminent; (2) a causal connection between the injury and the conduct; and (3) a likelihood that the injury will be redressed by a favorable decision." *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 598 (9th Cir. 2014) (citing *Lujan*, 504 U.S. at 560–66).

"[A]n organization whose members are injured may represent those members in a proceeding for judicial review." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

> An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Finally, Alliance must also show statutory standing. *See Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008).

Alliance alleges both procedural and substantive ESA injuries. ECF No. 37

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 40

at 16. "Plaintiffs alleging procedural injury must show only that they have a procedural right that, if exercised, *could* protect their concrete interests." *Salmon Spawning*, 545 F.3d at 1226 (citation and internal quotation marks omitted); *see also City of Sausalito*, 386 F.3d at 1197 (holding that plaintiffs alleging procedural injury must show "(1) the [agency] violated certain procedural rules; (2) these rules protect [a plaintiff's] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests.") (citation omitted); *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n.*, 457 F.3d 941, 949 (9th Cir. 2006) (same). "The concrete interest test has been described as requiring a geographic nexus between the individual asserting the claim and the location suffering an environmental impact." *Nuclear Info.*, 457 F.3d at 950 (citation and internal quotation marks omitted).

Aesthetic and recreational harm satisfies the injury in fact requirement. *See Sierra Club*, 405 U.S. at 734. Alliance established such an injury in its declarations claiming that Alliance, and its members, continually visit the federal lands at issue and have a scientific, recreational, aesthetic, personal, spiritual, and professional interest in the forest's health, including providing grizzly bear habitat. *See id.* at 735; ECF Nos. 37-1, 37-2. Though Alliance and its members have seen no grizzlies in the disputed area, they hope for a grizzly bear sighting someday on these federal lands. *Id.* The Ninth Circuit has repeatedly held that these types of injuries satisfy

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 41

the injury in fact requirement. *See generally Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1176–77 (9th Cir. 2000) (collecting cases). Alliance established a sufficiently concrete interest by discussing the geographic nexus between Alliance and the Mission Project. *See Nuclear Info.*, 457 F.3d at 950; ECF Nos. 37-1, 37-2. If proven, Alliance's request to reinitiate formal consultation under the ESA *could* protect their concrete interests. *See Salmon Spawning*, 545 F.3d at 1226.

Because this Court determines Alliance has established standing on its procedural injury, it need not address whether Alliance has also established a substantive injury. Even though the parties offer no argument on the other standing elements, this Court finds these elements have been met.

### 3.    Reinitiation of Formal Consultation

Alliance claims new information exists that may affect grizzly bears in ways not previously considered by the Forest Plan. ECF No. 19 at 40–45. But the new information Alliance cites does not require the Forest Service to reinitiate formal consultation.

FWS listed the grizzly bear as threatened in 1975, and it promulgated the original grizzly recovery plan in 1982. SUPP AR 00035. "Recovery plans delineate reasonable actions that are believed to be required to recover and/or protect the species." SUPP AR 00034. The original recovery plan identified "six different,

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 42

geographically isolated ecosystems extending from the Greater Yellowstone area, to parts of Idaho and Montana, the North Cascades area of Washington, and into southeast British Columbia." *Crow Indian Tribe v. United States*, 965 F.3d 662, 672 (9th Cir. 2020). But despite the recovery plan, "[a]t present, only two ecosystems have a substantial population of grizzlies: the Greater Yellowstone Ecosystem . . . which has approximately 700 bears, and the Northern Continental Ecosystem of northcentral Montana, which is estimated to have approximately 900 bears." *Id.*

In 1989, the Forest Plan nevertheless recognized grizzly bears historically occupied much of the OWNF. AR 00982. During the mid-nineteenth century, reports documented that hundreds (if not thousands) of grizzly hides were taken in the region. *See id*. While the records do not specifically confirm where the bears were killed, the Forest Service accepted that some hides came from the North Cascades. *Id*. Records further suggested that a small grizzly population remained in the North Cascades and in the OWNF, mainly in the Pasayten Wilderness. *Id.*

The Forest Service initiated formal consultation with FWS in March 1986. AR 00233. The Forest Plan lists several species that were thought to occur on the OWNF at that time, including grizzly bears. *Id*. It also recognizes that FWS listed the grizzly as a threatened species, which had been reported to occur on or near the area. AR 00884. Still, it observed there had been no confirmed sightings at that time. *Id.*

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 43

FWS recommended that the Forest Service develop criteria for inventorying grizzly bears and other potentially threatened or endangered species. AR 00233. The Forest Service began participating in a cooperative interagency project to determine grizzly bears' status in the North Cascades and evaluate the habitat capability to support grizzly bears. *Id.*; *see also* AR 00334; AR 00884; AR 00962. In the Biological Assessment appended to the Forest Plan, the Forest Service observed that the interagency project studying possible grizzly bear in the area was underway:

> When the project to assess the population status and the habitat capability of the area is complete, the Interagency Grizzly Bear Committee will recommend either the area has the potential to support a viable population and will be established as a recovery area, that the potential of the area to support a grizzly bear population is low and the area will not be managed to recover the bear population, or the area is capable of supporting a viable population, but will still not be managed to recover the grizzly bear.
>
> Because the population status of the grizzly bear on the Forest has yet to be determined, assessment of the impacts of resource projects on bears is difficult. All projects proposed will include a biological assessment of the impacts on bears and be coordinated with the U.S. Fish and Wildlife Service.

AR 00984. Even so, the Forest Plan documented "all habitat components known to support grizzly bear populations in other areas are present on the forest." AR 00982.

In 1993, about four years after the Forest Service issued the Forest Plan, FWS approved a revised Grizzly Bear Recovery Plan. SUPP AR 00033. "[H]abitat research confirm[ed] that the North Cascades evaluation area offers sufficient

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 44

amounts of quality habitat to warrant grizzly bear recovery in the area." SUPP AR 00056; *see also* SUPP AR 00209. In a 1997 supplement to the Grizzly Bear Recovery Plan, FWS found that North Cascades recovery zone would likely support a population of "between 200-400 grizzly bears," yet noted this estimate might change as more research is completed "on population dynamics." SUPP AR 00210.

Since 1990, FWS has "received and reviewed five petitions requesting a change in status for the North Cascades grizzly bear population (55 FR 32103, August 7, 1990; 56 FR 33892, July 24, 1991; 57 FR 14372, April 20, 1992; 58 FR 43856, August 18, 1993; 63 FR 30453, June 4, 1998)." 79 Fed. Reg. 72450, 72487 (Dec. 5, 2014). In response, FWS determined that grizzly bears in the North Cascade ecosystem warrant a change to endangered status, and, as recently as 2014, continued "to find that reclassifying this population as endangered is warranted but precluded [due to funding issues and higher priority listings]." *Id*. at 72487–89.

In January 2017, FWS and the National Park Service ("NPS") issued a Draft Grizzly Bear Restoration Plan and EIS for the North Cascades Ecosystem ("NCE"). ECF No 19-2 at 24. That document highlights: "Only four confirmed grizzly bear sightings have been documented within the NCE during the past decade; three of these observations were of the same bear, and one observation was of a second bear (IGBC NCE Subcommittee 2016). All of these sightings have been in British Columbia." *Id*. at 52. FWS and NPS have since discontinued the proposal to

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 45

develop and implement a Grizzly Bear Restoration Plan for the NCE, thus terminating the EIS for a Grizzly Bear Restoration Plan. *See* ECF No. 19-2 at 346.

Alliance claims that all these post-Forest Plan findings, actions, and proposals by FWS (and others) require reinitiation of formal consultation because it constitutes "new information . . . not previously considered" under 50 C.F.R. § 402.16(a)(2). ECF No. 19 at 35–45. It also claims the effects roads have on grizzly bears constitutes "new information." *See id*.

New information does not always require reinitiation of consultation. *See Conservation Cong. v. Finley*, 774 F.3d 611, 619 (9th Cir. 2014) (quoting *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987) ("Every modification of or uncertainty in a complex and lengthy project [does not] require[] the action agency to stop and reinitiate consultation.")). *Finley* makes clear new studies require an action agency to reinitiate formal consultation only when the original consultation neglected to previously consider the effects that the new study reveals the proposed action will create for listed species or their critical habitat. 774 F.3d at 619–20, n.3 (affirming denial of a reinitiation claim based on the publication of a recovery plan containing "new" studies drawn from old information).

Alliance has identified no "new information" revealing that the Mission Project will create effects that may affect grizzly bears or their critical habitat in ways that the Forest Service has not previously considered. *See* 50 C.F.R. §

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 46

402.16(a)(2). In 1989, when the Forest Service issued the Forest Plan, grizzly bears were listed as threatened—they still are. Grizzlies were also thought to inhabit the OWNF—they still are. But no grizzlies have been seen in the OWNF, just like in 1989. And the closest sighting occurred several years ago in British Columbia, well north of the Mission Project. The Forest Plan recognized that the OWNF has all habitat components known to support grizzly bears, which later studies confirmed. Indeed, the Forest Plan documented that hundreds of grizzlies historically occupied the region. Just because a new study found that the OWNF has the carrying capacity to support a hypothetical population of between 200 and 400 grizzly bears, that study does not reveal any actual "effects of the [Mission Project] that may affect [grizzly bears] or [their] critical habitat in a manner or to an extent not previously considered." *See* 50 C.F.R. § 402.16(a)(2). No documented grizzly bear population exists in the OWNF, so any possible environmental effects stemming from the Mission Project cannot possibly affect a non-existent population of bears.

Alliance relies on *Cottonwood*, 789 F.3d 1075 and *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106 (N.D. Cal. 2017), but both cases are distinguishable. *Cottonwood* determined that an agency had to reinitiate formal consultation because FWS's new critical habitat designation for the Canada lynx satisfied the "new information" trigger. 789 F.3d at 1087–88. But here, no area within the Mission Project has been designated as critical habitat for the grizzly

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 47

bear. And in *Hoopa Valley Tribe*, it was undisputed that the action agencies had to reinitiate formal consultation after a parasite, known to infect salmon, was found at rates exceeding the maximum percentage permitted by the controlling incidental take statement. 230 F. Supp. 3d at 1130. But here, Alliance has cited no incidental take statement, much less one that the Mission Project might exceed for grizzlies.

As for roads, the environmental effects of roads on grizzlies were well-known when the Forest Service issued the Forest Plan. *See, e.g.*, SUPP AR 00021–30 (citing B. N. McLellan and D. M. Shackleton, *Grizzly Bears and Resource-Extraction Industries: Effects of Roads on Behaviour, Habitat Use and Demography*, J. of Applied Ecology 451–60 (1988)). The Forest Plan considered these effects in a section addressing anticipated impacts on grizzly bears,

> Although all habitat components occur throughout the North Cascades, the majority of bear use is expected to occur on the more remote areas of the Forest, primarily the Pasayten Wilderness (530,000 acres), Lake Chelan/Sawtooth Wilderness (96,000 acres), and the North Cascades Scenic Highway Corridor (88,000 acres). These reserved areas are located in the northwest and western portions of the Forest and *none of them will be affected by timber harvest activities or major road construction.*

AR 00983 (emphasis added). Despite the Forest Plan's original finding that road construction will unlikely affect grizzly bears in the Project area, it required "[a]ll projects proposed will include biological assessment of the impacts on bears and [will] be coordinated" with FWS. AR 00984. That has happened here.

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 48

The Biological Assessment considers the effects of roads on grizzlies, as required by the Forest Plan. *See, e.g.*, AR 15293–94. "Because of the potential affects that road and trails can have on grizzly bears, human access management remains one of the most powerful tools for protecting and recovering grizzly bear populations." AR 15294.

> Effects to grizzly bears were assessed by buffering roads, motorized trails and high-use non-motorized trails by 500 meters, to calculate the amount of core area in the two BMUs [Bear Management Units], as described in Gaines et al. (2003). The area outside of the buffer is the core area. This measure is intended to assess how much undisturbed habitat is available to grizzly bears.

*Id.* The Biological Assessment also highlights that "[t]reatments include a suite of restoration actions" like "decommissioning and closing roads." AR 15240.

The Forest Service initiated informal consultation, and FWS determined that the "[t]he likelihood of direct disturbance to grizzly bears is discountable due to their rareness, wide-ranging habitat use, and the tendency of this species to avoid areas with human activity." AR 15610. In addition, the "potential for temporary displacement and minor habitat alteration in the Project area is likely to be insignificant to the survival, reproduction or distribution of the grizzly bear." AR 15610. FWS thus concurred with the Forest Service's determination that Project "may affect" but is "not likely to adversely affect" grizzly bears. AR 15613.

In short, Alliance has shown no "new information" revealing effects of the

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 49

Mission Project that may affect grizzly bears or their critical habitat in a way that the Forest Service did not previously consider. Thus, Forest Service did not act arbitrarily and capriciously when it determined not to reinitiate formal consultation.

### 4.    Challenge to Biological Assessment

Alliance finally argues the Biological Assessment ("BA") failed to analyze and disclose the Mission Project's impact on road density, which it asserts is an important aspect of the grizzly bear problem and recognized as the best available science. ECF No. 19 at 46–47. Defendants counter the BA is nonjusticiable under the APA but, if this Court reaches Alliance's argument, it fails on the merits. The Court finds Alliance's argument justiciable but agrees with Defendants that it fails on the merits.

Under the APA, "two conditions must be satisfied for agency action to be 'final': First, the action must mark the consummation of the agency's decisionmaking process . . . [a]nd second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations and citations omitted). "BAs do not generally constitute final agency actions within the meaning of the APA." *Oregon Wild v. U.S. Forest Serv.*, 193 F. Supp. 3d 1156, 1164 (D. Or. 2016). But when a final agency action, like a letter of concurrence, relies on a BA to conclude no further consultation is necessary, a court may review the BA. *Id*. Here,

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 50

FWS based its concurrence on "information [the Forest Service] provided in [its] BA" and the "Project being implemented as described in the BA and [FWS's] current understanding of the species' use of the Project area." AR 15613. This Court finds the BA justiciable because FWS's letter of concurrence relies primarily on the BA in reaching its final determination that the Project "may affect" but is "not likely to adversely affect" grizzly bear and that, as a result, it need not reinitiate formal consultation. *See Oregon Wild*, 193 F. Supp. 3d at 1164.

As for the merits, federal agencies must "use the best scientific and commercial data available" when determining whether a proposed action will "jeopardize" endangered or threatened species or their critical habitat. 16 U.S.C. § 1536(1)(2). This requirement "ensure[s] that the ESA not be implemented haphazardly, on the basis of speculation or surmise." *Bennett*, 520 U.S. at 176. "Under this standard, the agency must not 'disregard available scientific evidence that is in some way better than the evidence it relies on.'" *Nat'l Family Farm Coal. v. U.S. Env't Prot. Agency*, 966 F.3d 893, 925 (9th Cir. 2020) (quoting *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014)). Courts will not "second guess the agency's decisions using our own judgment." *Nat'l Family Farm*, 966 F.3d at 925. "Because what constitutes the best scientific and commercial data available is itself a scientific determination, it belongs to the agency's special expertise and warrants substantial deference" *Id*. (citations and

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 51

internal quotation marks omitted).

This Court will not second guess FWS's and the Forest Service's determination here. Granted, an Interagency Grizzly Bear Committee Taskforce Report concluded "open road density, total motorized access route density along with the presence of core areas, are important elements in the management of human access within grizzly bear recovery zones." ECF No. 19-1 at 12. But just because the Forest Service declined to analyze "open road density," it did not disregard "available scientific evidence that is in some way better than the evidence" it relied on. *See Nat'l Family Farm*, 966 F.3d at 925. Instead, it performed a "core area" analysis, which, as described above, analyzed effects to grizzly bears by buffering roads, among other things. AR 15294. It determined: "Road closures and decommissioning would occur and would increase core area for bears. There would be no net loss of core in the [BMUs]. Temporary roads are not in core area." *Id*.

The Forest Service did not disregard better scientific evidence that was "readily available" when it opted to perform a "core area" analysis. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (When "the information is not readily available, we cannot insist on perfection: [T]he best scientific . . . data available, does not mean the best scientific data possible.") (citation and internal quotation marks omitted). Alliance has identified no road density analysis related to the Mission Project that the Forest Service ignored,

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 52

rejected or disregarded. Indeed, it appears no road density analysis for the Mission Project currently exists, and the Forest Service would be required to generate new data and reports. *See Nat'l Family Farm*, 966 F.3d at 926. This Court bases its decision on "the fact that the best-scientific-data-available requirement 'does not require the agency to conduct new tests or make decisions on data that does not yet exist.'" *See id.* (quoting *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1047 (9th Cir. 2015)).

This Court finds a rational connection between the facts found and the conclusions made regarding the road-related effects on grizzly bears. As a result, the Forest Service—in consultation with FWS—did not act arbitrarily and capriciously when it determined the Project "may affect" but is "not likely to adversely affect" grizzly bears.

## CONCLUSION

In conclusion, this Court grants Defendants' cross-motion for summary judgment and to denies Alliance's motion for summary judgment.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendants' Motion Cross-Motion for Summary Judgment, **ECF No. 20**, is **GRANTED**.

2. Plaintiff's Motion for Summary Judgment, **ECF No. 19**, is **DENIED**.

3. All claims are **DISMISSED WITH PREJUDICE**, with all parties to

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 53

bear their own costs and attorney fees.

4.      All pending motions are **DENIED AS MOOT**.

5.      All hearings and other deadlines are **STRICKEN**.

6.      The Clerk's Office is directed to **ENTER JUDGMENT** in Defendants' favor and **CLOSE** this file.

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this 1st day of December 2020.

SALVADOR MENDOZA, JR.
United States District Judge

ORDER GRANTING GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – 54